## W. T. STRONG v. THE STATE.

### No. 1977.  Decided April 16, 1913.

**1.—Gaming—Lease—Sublease—Charge of Court—Contract.**

Where, upon trial of knowingly permitting gambling on premises under his control, the evidence showed that the defendant was the lessee thereof and had undertaken to sublet the same, but there was no express or implied privity of contract between the original owner or lessor and the alleged subtenant, the latter did not become the tenant of the said original lessor, and there was no error in the court's failure to define such sublease or to instruct the jury that if said subtenant was in control of said premises to acquit defendant. Davidson, Presiding Judge, dissenting, holding that such privity of contract did exist.

**2.—Same—Permitting Gaming—Owner—Lessee—Statutes Construed.**

The owner who rents his premises to another can be convicted of knowingly permitting gaming when he knowingly permits his tenant or lessee to use the rented premises as a place for gambling, as under article 567, Penal Code, the lease is at once canceled. Qualifying Borchers v. State, 31 Texas Crim. Rep., 517, and other cases. Davidson, Presiding Judge, dissenting.

**3.—Same—Charge of Court—Requested Charge—Control of Premises.**

Where, upon trial of knowingly permitting gambling on premises under defendant's control, even if the evidence raised the issue that the defendant had sublet the premises and had thereby lost control of same, the court having instructed the jury that they could not convict the defendant unless they believed beyond a reasonable doubt that he knowingly permitted said gambling and that the premises were under his control, there was no error in the court's failure to submit in a more affirmative way a charge as to whether defendant or his alleged subtenant had such control. Davidson, Presiding Judge, dissenting.

**4.—Same—Owner—Lessor—Sublease—Statutes Construed.**

Under article 567, Penal Code, it is immaterial whether the defendant was the owner in fee of the premises permitted to be used by him for gambling, or whether he was the lessee and sublet the premises to a subtenant, as the subletting immediately terminated such sublease, and if he knowingly permitted gaming to continue therein, he was guilty under article 559, Penal Code, of knowingly permitting such gaming on premises under his control. Davidson, Presiding Judge, dissenting.

**5.—Same—Charge of Court—Possession—Control—Sublease.**

Where, upon trial of knowingly permitting gaming, etc., defendant claimed

that he had sublet the premises, but the evidence showed that he had actual possession and control of the same and knowingly permitted gaming thereon, he was guilty under article 559, Penal Code, and there was no error in the court's failure to submit the issue as to who had the right to control under the sublease, and this, even if there was slight evidence that the subtenant had control by reason of his sublease. Following Bishop v. State, 43 Texas, 390, and other cases. Davidson, Presiding Judge, dissenting.

**6.—Same—Indictment—Precedent.**

Where, upon trial of permitting gambling on premises controlled by the defendant, the indictment followed approved precedent, there was no error in overruling the motion to quash.

**7.—Same—Article 743, Code Criminal Procedure—Practice on Appeal.**

Since the adoption of article 743, Code Criminal Procedure, the court has not looked with so much favor on the omissions of the charge of the court, in the absence of a bill of exceptions at the time of the trial and a special requested charge, although the court will consider, in felony cases, objections made to the charge of the court in a motion for new trial. Following Mitchell v. State, 65 Tex. Crim. Rep., 545, 144 S. W. Rep., 1006.

**8.—Same—Names of Witnesses on Indictment.**

Article 444, Code Criminal Procedure, providing that the names of the State's witnesses must be indorsed on the indictment is merely directory, and unless injury is shown, there was no error in not giving defendant the names of such witnesses at the time he applied therefor and forcing him to trial; besides, it was shown that he could have procured such names. Harper, Judge, dissenting. Davidson, Presiding Judge, expressing no opinion.

**9.—Same—Allusion to Defendant's Failure to Testify.**

Where, upon appeal of a conviction of knowingly permitting gambling on premises under defendant's control, the record did not show any allusion to defendant's failure to testify, there was no error on this ground.

**10.—Same—Remarks by Judge—Interrogating Witness.**

Where, upon trial of knowingly permitting gambling on premises under defendant's control, the defendant claimed on appeal that the court, in interrogating a witness, implied by his manner that the defendant was guilty, but the record showed that there was no such implication on the part of the trial judge, there was no error. Harper, Judge, dissenting, holding that there was such implication. Davidson, Presiding Judge, expressing no opinion.

**11.—Same—Misconduct of Jury—Pleading—Affidavit.**

Where, upon appeal from a conviction of knowingly permitting gambling on premises under defendant's control, the affidavits of two of the jurors were attached to defendant's motion for new trial, in which it is claimed that these two jurors discussed the facts in another trial, but the record showed that the trial court had heard the motion and the evidence thereon and overruled the same, it must be presumed that he heard evidence on said misconduct and found the same insufficient, outside of said affidavits which were merely pleading and not evidence in the case. Harper, Judge, dissenting. Davidson, Presiding Judge, expressing no opinion.

**12.—Same—Reversal—Practice on Appeal.**

See opinion for views of Davidson, Presiding Judge, holding that the judgment should be reversed and the cause remanded, because the evidence showed that defendant was not in control of the premises where gambling was permitted, and because the court failed to submit the proper charge; and Harper, Judge, dissenting, but agreeing to a reversal because defendant was denied the names of the State's witness which were not endorsed on the indictment, and because of the misconduct of the jury and the remarks of the trial judge in interrogating a witness. Prendergast, Judge, dissenting, holding that the judgment be affirmed.

Appeal from the Criminal District Court of Dallas No. 2. Tried below before the Hon. Barry Miller.

Appeal from a conviction of knowingly permitting gambling on premises under defendant's control; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*W. F. Ramsey* and *Allen & Flanary* and *Gibson & Callaway* and *C. F. Greenwood,* for appellant.—On question of the court's charge and failure to construe the second lease from defendant to the subtenant: Smith v. State, 24 Texas Crim. App., 1; Broxton v. State, 9 id., 97; Overly v. State, 34 Texas Crim. Rep., 500; Darbyshire v. State, 36 id., 547; Wright v. State, 37 id., 3; Monford v. State, 35 id., 237; Floeck v. State, 34 id., 314; Scott v. State, 35 id., 11; Robinson v. State, 24 Texas, 152; Cherry v. State, 30 Texas, 439; Borchers v. State, 31 Texas Crim. Rep., 517; Brumley v. State, 12 Texas Crim. App., 609; Elliott v. State, 39 Texas Crim. Rep., 242; Com. v. Wentworth, 146 Mass., 36; State v. Frazier, 8 Atl. Rep., 347; State v. Abrahams, 71 Am. Dec., 399; Santos v. State, 65 Texas Crim. Rep., 518, 146 S. W. Rep., 919.

On question that court's charge must meet every issue raised by the evidence: Reynolds v. State, 8 Texas Crim. App., 412; Richardson v. State, 9 id., 612; Morales v. State, 36 Texas Crim. Rep., 234; Jones v. State, 35 id., 565; Reeves v. State, 34 id., 483; James v. State, 32 id., 509; Pollard v. State, 33 id., 197; Sowell v. State, 32 id., 482; Greta v. State, 9 Texas Crim. App., 429.

On question of remarks by judge in interrogating witness: Moore v. State, 33 Texas Crim. Rep., 306; Kirk v. State, 35 id., 224; McCullar v. State, 36 id., 213; Manning v. State, 37 id., 180; Wragg v. State, 65 Texas Crim. Rep., 131, 145 S. W. Rep., 342.

On question of misconduct of jury: McWilliams v. State, 32 Texas Crim. Rep., 269; Mitchell v. State, 36 id., 278.

On question of allusion to defendant's failure to testify: Tate v. State, 38 Texas Crim. Rep., 261; Wilson v. State, 39 id., 365; Thorpe v. State, 40 id., 346; Cowan v. State, 49 Texas Crim. Rep., 466, 93 S. W. Rep., 553; Wooley v. State, 50 Texas Crim. Rep., 214, 96 S. W. Rep., 27.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The facts disclose that appellant leased a certain building known in the statement of facts as the Astor hotel, on Main Street, in the City of Dallas, at two hundred dollars per month. This rental was due in advance on the first day of each month. That part of the building rented consisted of the second and third floors. The contract was for two years, beginning January 1, 1911. The contract was in writing, and signed by H. L. Edwards, Thomas Bros., W. Leslie Williams, and by appellant. Williams was the

party through whom appellant leased the property. Within a month perhaps after the execution of this lease contract, appellant, with the consent of Williams, sub-let or sub-leased the identical property to Gurdy. The lease or sub-lease to Gurdy by appellant was in writing and a duplicate of the lease from Williams to appellant except necessary changes to meet the fact it was a sub-lease. Williams testified in this respect substantially as follows: . Shortly after the lease appellant asked him to change the wording of the contract in regard to subletting the same. Witness refused to change the writing in the contract, but informed appellant that it would not make any difference about him sub-letting the building, but he would not release appellant from paying the rent. He says, "I told him if he did sub-let the building I would look to him for the money; that I would not release him from liability." The day after the execution of the lease to appellant, Williams says, "I expressly told him that he could sub-let the premises." It is also shown that appellant was engaged in running a gravel pit west of Dallas. The State further introduced testimony to the effect that gambling was carried on in a room on the third floor of the building, and there is some evidence that appellant was in that room on one or two occasions, and from the circumstances it may be deduced that appellant was aware that gambling occurred in the room. The State further showed it was a gambling room, with the paraphernalia and matters of that sort, and quite a number of games were played there. Witnesses testified that a man named Cornwall would sell the checks, and take in the "rake-off" or "take-off," but that appellant never had anything to do with the games. Appellant introduced in evidence the written lease from himself to Gurdy. This written lease was for the same premises and building described in the lease contract from Williams to appellant, the difference being that it only covered one year instead of two years, as did appellant's lease. All the gambling herein mentioned and all the matters connected with this transaction occurred within the time of the lease by appellant to Gurdy. Gurdy was to pay appellant $250 a month in addition for the building, and the evidence shows that he did pay it as per agreement. Gurdy took charge and ran it as a hotel, with the usual number of clerks and such things, and all rooms on the second and third floors of the house were under the control of Gurdy, and in his absence under the control of his clerks and employes. It is shown that occasionally he was out of the city on short trips. On the third floor there was a club room, a gymnasium and the room in which the gambling occurred. It is also shown in this connection that appellant in the hallway on the second floor had a desk where he sometimes transacted his private business, which was in no way connected with the hotel. Perry, Riley and Dymock were the clerks at the hotel; sometimes one was on duty at night and sometimes the other. Riley testified that he collected the money and turned it over to Gurdy, and in Gurdy's absence would pay the rent, and attend to all matters of that sort necessary about the hotel. All witnesses who

testified in that respect stated that appellant exercised no authority or control over the building, or over any of the employes in or about the building, and that Gurdy was present continually when not "off on short trips." The indictment contains six counts. It is unnecessary to mention any of the counts except those submitted by the court in the charge, which were the first and second counts. The first count charged that appellant did unlawfully keep and was interested in keeping the premises and building for the purpose of being used as a place to bet, wager and gamble with cards, etc. The second count, the one under which the conviction occurred, charged appellant "did then and there unlawfully and knowingly permit a certain building, room and place, which building, room and place was then and there under the control of the said W. T. Strong to be used as a place to bet, wager and gamble with cards, and as a place where people resorted for the purpose of betting, wagering and gambling with cards against the peace and dignity of the State."

So it will be discovered from the indictment, charge of the court and verdict of the jury that it was under the second count the conviction occurred. The statute, article 559, reads as follows: "If any person shall rent to another, or shall keep or be in any manner interested in keeping, any premises, building, room or place for the purpose of being used as a place to bet or wager, or to gamble with cards, dice, dominoes, or to keep or exhibit for the purpose of gaming, any bank, table, alley, machine, wheel or device whatsoever, or as a place where people resort to gamble, bet or wager upon anything whatever, or shall knowingly permit property or premises of which he is owner, or which is under his control, to be so used, shall be guilty of a felony, and, upon conviction shall be punished by confinement in the penitentiary," etc. Applying the provisions of this statute to the two questions submitted by the court, it will be discovered that under the first count it would be necessary to show that appellant was either the keeper or interested in keeping the premises for gambling purposes. Under the second count it would be necessary for the indictment to charge either that appellant as owner knowingly permitted the premises to be used for such gambling purposes, or that the premises were under his control and that he permitted it to be used for such purpose. So this clause of the statute provides a different means of committing the offense from that charged in the first count. The jury having acquitted of that charge, it is unnecessary to notice it further with any degree of particularity. Under the second count a party may be indicted in one of two ways: either that as the owner he knowingly permitted his premises or property to be used for such gambling purposes, or not being the owner, he permitted the premises when under his control to be used for said purposes. Appellant could not be convicted as the *owner*, because there was *no allegation that he was the owner*. Therefore, he could be convicted only under the other clause, if at all, for permitting premises under his control to be used for the purposes indicated. The evidence

is conclusive that he was not the owner of the property. It was leased by appellant, therefore he was not the owner. It would be a self-evident proposition that appellant *could not lease from himself his own property, or property of which he was the owner*. It is also uncontroverted that with the *consent* of the *lessor* appellant *sub-leased* the property in question for one year, and *in writing* to his sub-tenant or sub-lessee Gurdy; that Gurdy went in possession of the property and ran it as a hotel, employing all clerks and other employes about the hotel necessary for that purpose. Without going into any statement further than above, the evidence, we think, is undisputed that appellant leased the property. It is also undisputed that appellant *in writing sub-leased the property for one year to Gurdy*. This lease was read in evidence before the jury as well as the written lease from the landlord to appellant. It is evident that unless it is shown that the premises were under the control of appellant at the time the gambling was carried on, he could not be convicted under the second count. Two things must concur, first, that the premises were under the control of the accused, and, second, that he knowingly permitted gambling to go on in those premises or in the building while it was under his control, otherwise the State would not have a case.

The first proposition in this connection is, the court erred in failing and omitting to instruct the jury in affirmative language that unless appellant and not Gurdy had the premises under his control at the time of the alleged gambling, he would not be guilty. This charge should have been given. The court, submitting the second count, confined the jury to the issue that appellant knowingly permitted the building, room or place which was then and there under his control to be used as a building, room or place for the purpose of gaming, and that people resorted there, etc., for that purpose. Appellant requested the following charge, which was given:

"You are instructed in this case at the request of the defendant to be construed in connection with the main charge of the court that before you can find the defendant guilty under the second count contained in the indictment, you must believe from the evidence beyond a reasonable doubt, the defendant did knowingly permit premises under his control to be used as a place for gaming.

"And in this connection you are told that the word 'knowingly' means with full knowledge and intentionally, and unless you do believe from the evidence beyond a reasonable doubt that the defendant with full knowledge did permit the premises to be used as a place for gaming, and further believe that the premises were under his control, you can not convict the defendant under the second count."

In the motion for new trial the court's general charge is criticised because it did not affirmatively submit to the jury the issue as to whether defendant had possession and control of said building and premises in question at the time the game is alleged to have occurred, or whether Gurdy had the actual exclusive possession and control of

the premises at said time; and it is contended the evidence conclusively shows that Gurdy did have actual and sole possession and control of said building and premises at all of said times when gambling is alleged to have occurred, but the issue being strongly raised, should have been affirmatively submitted to the jury in the charge of the court, and the failure of the court to so affirmatively submit the issue greatly prejudiced the rights of this appellant upon the trial and resulted in his hurt and injury, and must have caused the jury to believe that the issue was not raised by the evidence, or that the court did not give credit to the testimony of the defendant's witnesses upon said issue. That issue was not submitted pertinently in any charge given. We are of opinion that this criticism of the charge is correct. In a general way the court charged the jury, both in the court's charge and in the requested instruction, that they must find that the premises were under his control, and in that connection gave a definition of "knowingly." In this connection it is also perhaps necessary to notice that the court gave the general definition of principals, but in the application of the law of principals the court confined it to the first count in the indictment and not the second, and nowhere did he give the charge in regard to principals as to the second count. The central thought of the case was whether appellant was in charge of the premises or whether Gurdy endorsing the principles therein laid down is Humphries v. State, 68 lant should have been acquitted. The entire testimony for the defendant from beginning to end was to show that he was not in control of the property, but that Gurdy was. *Appellant was not the "owner" of the property,* and, therefore, he could not be convicted from that standpoint. Sometimes the word "owner" may be held to include the lessee, but that construction could not obtain under this statute. The statute itself draws the distinction between the *owner who is in control of the property, or has it in possession, and one who is not the owner but has control and is in possession.* If the allegation had been that he was owner, then it would be required to show by the evidence that he was the owner. The conviction of an accused person under these provisions must depend upon his relation to the premises, and necessarily this must be limited on the trial to allegations in the pleadings. It will not do to say that he could be charged under one clause and convicted under another of the statute. The statute provides different means of constituting the offense, and it would take different evidence to sustain one from what it would the other. Of course, the instructions must conform to the pleadings and the facts, and the facts must sustain the pleadings and justify the charge which is given. Wherever the statute provides the relation of parties to the crime, the State must charge and prove those relations in order to secure a conviction, and it occurs sometimes under these statutes that the doctrine of principals would not apply, and we suppose the trial court recognized this in not applying the doctrine of principals to the second count. This question was discussed in the case of Mitchell v. State, 34 Texas Crim. Rep., 311. That

was a conviction under the disorderly house statute, which provided punishment against a party *who was the owner, lessee. or tenant,* and it was held that it *was necessary that one of those relations be charged and proved else conviction could not be sustained.* Following this and endorsing the principles therein laid down is Humphries v. State, 68 S. W. Rep., 681; Strong v. State, 52 Texas Crim. Rep., 133; Cook v. State, 42 Texas Crim. Rep., 539; Hamilton v. State, 60 S. W. Rep., 39. The proposition may be thus stated: Where the statute defines the offense and confines it to certain named relations, those relations must exist, or there can be no offense, for it would not be within the statute. Why is this so? Because the Legislature so determined by its authority, and limited the punishment to such defined offense. Cases supporting the proposition that the courts can not create offenses are too numerous to require citation; in fact, none ought to be required. It is basic, fundamental, constitutional. We are referred to article 388j of the original Act, now article 567 of the Revised Criminal Statutes, which reads as follows: "The use of any house, property or premises, by any tenant or lessee for any purpose, made unlawful by this law, shall terminate all rights and interests of such tenant or lessee in same, and shall entitle the owner thereof to the immediate possession of said house, property or premises." We suppose the contention of the State in this matter is intended to be if the house was used for gaming purposes and appellant was aware of that fact (the statute terminating the lease), that therefore he would be in possession of the premises, and any gambling that occurred in the house thereafter would render him guilty. It will be noticed by the provisions of article 567, supra, *that only the owner would be entitled to possession of the property as against the tenant or lessee.* The statute does not *entitle the tenant to possession.* *Owner* and *tenant* and *lessee* are not synonymous terms and do not mean the same thing under this statute. If the construction contended for by the State is correct; it would follow that gambling on the premises would put the tenant or lessee out of possession and place the owner in control. Appellant was the *lessee,* not the *landlord, and was not the owner.* To apply this to this case, and concede that when the gambling occurred the lease contract was terminated, who would be in control? The lease contract being out of existence, *the owner would be in possession,* the premises would revert to his control, and therefore he would be responsible. The *tenant* would, therefore, *be out of possession by operation of law.* The statute expressly provides that gambling shall terminate all rights and interest of such tenant or lessee in the property, and shall *entitle the owner* to the immediate possession. It does not, however, provide that the mere fact the owner is *entitled to* possession that therefore he is in possession of the property. What other steps requisite to be taken in order to assume possession of the property is not necessary here, we think, to decide. Appellant *was not the owner nor was he prosecuted as such.* The authorities agree to this proposition, that where the lessee sub-lets or sub-leases the property, and the

sub-tenant or sub-lessee goes in possession with consent of the landlord, the relation of landlord and tenant is created between landlord and sub-lessee, and the possession of the property is in the sub-tenant or sub-lessee. Judge Stayton, delivering the opinion in Forrest v. Durnell, 86 Texas, 647, thus states the proposition: "If the landlord consents, expressly or impliedly, to the occupancy of an assignor or under tenant the relation of landlord and tenant necessarily exists between him and such person, for under the statute such holdings are illegal without such consent." Under the law when the landlord consented to the sub-lease of the premises Gurdy became the under tenant or sub-lessee, and the relations of landlord and tenant thereby necessarily existed between such landlord and Gurdy. This proposition seems to have been announced in the cases generally in this State. In the case of Robinson v. State, 24 Texas, 152, Judge Roberts, speaking for the court, said: "Another objection to the charge is, in substance, that it assumes that the defendant retained either a partial or a conditional control of the rooms rented to Meroney which gave him a right and made it his duty to prevent illegal gaming in them upon learning it was being carried on there. We do not think this is a proper construction of the terms of the lease. The lease purported to direct the use to be made of the rooms by Meroney and restricted him to using them only as bedrooms or sleeping apartments, but it did not follow as a consequence of that restriction that the defendant retained a right to control the rooms either partially or conditionally, so as to impose it upon him as a duty to prevent illegal gaming. The question in the case was, did the defendant have really and substantially the control of the rooms; and was not the execution of the lease to Meroney a false pretense and sham device to shelter the defendant from responsibility. Under the facts in proof the court might have submitted that question to the jury. It would have enabled them to have considered the 'whole case in the true light as dictated by their knowledge and observation of such matters. We think the court incorrectly instructed the jury as to the legal effect of the terms of the lease. Judgment is reversed and cause remanded.' "

In the instant case the trial court did not even instruct the jury in regard to the effect of the sub-lease entered into between appellant and Gurdy. This he should have done. There is no reference to it in the charge at any point. In Borchers v. State, 31 Texas Crim. Rep., 517, Judge Hurt, speaking for the court, uses the following language: "The proof shows that the house called the premises in the information had been rented to, and in fact was under the control of Bell & Menasco, and that the defendant, though the owner, was not in control of same. Under such a state of facts he could not be convicted under article 365. But if the premises or house be rented to another for the purpose of being used as a place for playing, dealing or exhibiting any of the games prohibited by the provisions of chapter 3, Penal Code, the renter violates article 366, and is amenable to the punishment there named and

must be indicted under that article. The court charged the jury in substance that defendant would be guilty if he owned the house, knew that the cards were being played therein and did not revoke the lease and stop the playing. This is not the law, and the judgment is reversed and the cause is remanded." The same principle was laid down in Brumley v. State, 12 Texas Crim. App., 609. In Elliott v. State, 39 Texas Crim. Rep., 242, Jones v. State, 17 S. W. Rep., 719, and Clark v. State, 4 S. W. Rep., 658, it was held that a lessor has no legal right whatever to carry prohibited weapons upon the premises of his tenant during the continuance of his lease contract, and this for the simple reason that the premises during the time are no longer his, but are in the exclusive control and management of his tenant. The same principle was again laid down in Zallner v. State, 15 Texas Crim. App., 23.

If under the present law the lease would be abrogated the *owner* would be in possession. The law here abrogates the contract and not the act of the contracting parties. The relation of the parties to the crime is fixed by the statute and its terms.

The word "control" in this statute has a technical meaning well understood. The accused party must control the premises. The property must be so under his control that he has a right to direct and handle it and bid or forbid the use of it, and where guilt depends upon this control, the evidence must show it. In addition to cases already cited see Commonwealth v. Wentworth, 15 N. E. Rep., 138, 146 Mass., 36; State v. Frazier, 8 Atl. Rep., 347; State v. Abrahams, 71 American Decisions, 399.

No case has been cited to us which upheld the doctrine that where the property is in possession and under the control of the lessee, that the owner would be guilty of permitting the premises under his control to be used for gambling purposes. Nor has a case been cited to us, nor have we been able to find one, which holds that where the sub-lessee is in possession under the lessee, with the consent of the lessor, the owner or tenant has been held responsible criminally for permitting gambling on the premises, or that the property was under his control. The case of Santos v. State, 65 Texas Crim. Rep., 578, 146 S. W. Rep., 919, decided by this court, was decided upon a different proposition. In that case it was shown that the lessor had not authorized his tenant or lessee to sub-let the property, and it was therefore held by my brethren that De Los Santos and not the sub-tenant was in control of the house. The authorities seem to hold in that character of case that the legally unauthorized sub-tenant or sub-lessee would only be an employe of the lessee and not a tenant, unless, as before stated, with the consent of the lessor, Forrest v. Durnell, supra. In the case of Commonwealth v. Wentworth, supra, this question was decided as herein stated. Field, J., rendering the opinion of the court, said: "If a building is let to a tenant who enters into possession under a lease, the building is not under the control of the landlord, but is under the control of the tenant while he continues in possession under the lease, unless

there are special provisions in the lease which give the control to the landlord." Closing the case, the court said: "There was no evidence that the defendant actually had the control of the building described in the indictment. So far as appears, he had not the control, but he could have taken control by ejecting his tenant, if the tenant was using the building for the illegal sale of intoxicating liquors. The principal exception must be sustained, and it is unnecessary to consider the others." That case, we think, is in point here. The evidence, therefore, places Gurdy in control of the premises. The written lease so shows, all the oral testimony so shows, and it seems to be uncontradicted. The only evidence, as we understand the statement of facts, which tends even to show to the contrary is that appellant had a desk in the hallway on the second floor of the building, while Gurdy was in possession and ran it as a hotel. Because appellant guaranteed payment for the rent to the landlord did not put him in control. This did not put him in possession of the property. We are, therefore, of opinion that the court erred in not charging the jury as contended by appellant. The jury should have been instructed that unless appellant had the house under his control, or if there was a reasonable doubt about this he should be acquitted, and if Gurdy was in control of the premises, or there was a reasonable doubt of that fact, then appellant should be acquitted. We are of opinion further that unless the State can strengthen its case by other evidence upon another trial appellant is entitled to a verdict of not guilty. He is clearly entitled to a verdict of not guilty under the facts of this case, because the State failed to show he was in *control* of the house, and the testimony shows that he was not; and does show it was under the control of Gurdy.

If the lease was abrogated on account of the gambling, the statute by its express terms places the *owner* in possession. *Appellant was not the owner.*

It is called to the writer's attention, however, that in the case of Austin v. State, 61 Texas Crim. Rep., 573, in a dissenting opinion he used the following language: "If the owner of the house rents it to another, and the house is used for gaming purposes, when the renter did not rent it for that purpose, and he ascertains that his house is being so used, and he thereafter permits the gambling to go on, he would be guilty of permitting his property or premises to be so used. But in that case the renter would be guilty of keeping a gaming house; he would be in charge and control of the house himself. It would be his premises by reason of his rental contract; he would be in possession. This case comes within that clause of the statute. In a sense, every man who keeps a gaming house is permitting parties to play in the house, if in fact they do play there, but the statute in regard to permitting gaming in houses has no reference to this condition of affairs, for, under those circumstances, the man would be a keeper." The expression above, towit, "If the owner of the house rents it to another, and the house is used for gaming purposes, when the renter did not rent

it for that purpose, and he ascertains that his house is being so used, and he thereafter permits the gambling to go on, he would be guilty of permitting his property or premises to be so used," is singled out by my brethren as authority for holding appellant guilty for permitting gaming to go on in the house under his control. That was a dissenting opinion, and if it correctly announced the law it could not sustain this conviction because appellant was not the owner. The prevailing opinion had decided the Austin case adversely from the way I believed it ought to be, and in arguing upon the question the writer used, by way of reasoning, the quoted expression. The question in that case was whether the renter who had charge of the place and invited people to his house as a resort for gaming, and engaged in gaming with them, *was the keeper*, or that he was *permitting gaming in a house under his control*. The question of *ownership* was not in the case. Appellant was only the renter. My view of the law was that he was the *keeper* of the house under the facts under one clause of the statute, and *was not brought* under the clause which denounced punishment *for permitting gaming* in his house. Knox v. State, 62 Texas Crim. Rep., 512. My brethren took the other view of it, hence my dissent. The question was not in the mind of the writer, nor in the minds of the majority as to what would be necessary for the *owner* of the house to do in order to ascer- tain this right to *entitle* him to possession of the house. Ownership was not in the case, nor were we discussing article 567 of the Revised Penal Code, which provides termination of the lease between the tenant and the landlord and its effect. If the language had been in the prevailing opinion and not in the dissent, it would have been but dicta, because the question was not in the case, and, therefore, it could not have been necessary to a decision. The writer did not undertake to state what steps were necessary to resume possession of the property on the part of the *owner* when he ascertained gambling was going on in his house in order to make him guilty. A dissenting opinion is not an authoritative decision on any question, much less would an excerpt therefrom be so re- garded. But if a single expression is to be taken out of a dissenting opinion to be used as authority in a subsequent case, then all that is written in that connection should also go with it. *In no event was ap- pellant the owner* of the house in question in this case. He was a renter, and had transferred his lease, and Gurdy, his sub-lessee, was in possession.

Referring back a moment to the question involved as to the charge, we understand that the law of the case must be given, and where it is not given, and the error was one calculated to injuriously affect appel- lant's right, whether it be of omission or commission, the judgment should be reversed. If the court had given a charge to the effect that if the jury should find that Gurdy was in charge of the house and not appellant, and that by virtue of the lease contract the law put Gurdy in possession of the house, and they should find from the testimony. that he had actual control of it, they should acquit appellant, then the jury might and doubtless would have rendered a much more favorable

verdict to the accused than they did; that is, they might, and as we believe should have done. In this connection we would further say, upon another trial the court in his charge to the jury should construe the effect of the written lease by appellant to Gurdy. It was a contract, and whenever a written contract is in evidence it becomes the duty of the court to instruct the jury as to the legal effect of that instrument. It is not necessary to cite authorities in support of this proposition. This the court did not do, but left the jury, under the charge given, to determine whether or not they believed appellant was in control of the house, without charging affirmatively either the effect of the lease or appellant's side of the evidence, that he was not in possession, but that Gurdy was.

If the lease was canceled by the statute, then it is evident from the terms of that statute and the facts that appellant was not in possession because he was but the lessee. Under the statute in question the owner is not the lessee, nor the lessee the owner. It is based on this wide distinction.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

### CONCURRING OPINION.

HARPER, JUDGE.—Being unable to agree in their entirety with either the opinion of Presiding Judge Davidson or of Judge Prendergast, I deem it proper to state my views upon the main issues.

In the first place we can not agree as to the proposition of our presiding judge that Gurdy ever became the tenant of the owner of the building. There was no express privity of contract between them, nor could it be implied, but the evidence rebuts such theory, consequently those cases cited by our presiding judge do not apply to the facts in this case. The contract contained an express stipulation against subleasing, and the agent of the owner stated to appellant he would not change such condition in the lease; but says, "I told him that it did not make any difference about him subletting the building, but that I would not release him from liability." And further testified that appellant had continually paid him the rent each month, and under the agreement between them he looked alone to appellant, to which terms appellant consented and agreed. In addition to this the lease contract from Edwards to Strong was for two years from January 1, 1911, while the contract between Strong and Gurdy was only for one year from February 1, 1911. Our Supreme Court in the case of Davis v. Vidal, 151 S. W. Rep., 290, gave the question here presented exhaustive study, and in an able opinion held that Gurdy would not become the tenant of Edwards, the owner, but Strong would still remain Edwards' tenant, and Gurdy would become a tenant of Strong. The sound reasoning in that case appeals to us, and we are fully convinced it correctly announces the law, and we refer to it for the authorities so holding.

Again, we can not agree with the opinion of our presiding judge wherein he says the rule of law as announced in Borchers v. State, 31 Texas Crim. Rep., 517, and other cases, is still the law in this State— that an owner who rents his house to another can not be convicted when he knowingly permits his tenant or lessee to use the rented property as a gambling house. The reason for the rule of law as announced in that case and other cases so holding no longer exists in this State, the reason being that when an owner made a valid lease contract, he parted with his property for the time and had no control over it, and, therefore, could not be held criminally liable for any act of his tenant during the life of the lease contract. This rule of law was the occasion and reason for the Legislature enacting article 567 of the Code: ."The use of any house, property or premises, by the tenant or lessee for any purpose made unlawful by this law (the gambling law) shall terminate all rights and interests of such tenant or lessee in same, and shall entitle the owner to the immediate possession of said house, property or premises." Wherever such statute has been adopted it has been held that the use of the house or premises for the prohibited purposes cancels the lease, and the relation existing between the tenant and landlord becomes the same in law as if one held over after the termination of the lease. (Taylor's Landlord and Tenant, sec. 521, and authorities; Cyc., vol. 24, p. 1353, and cases cited; Am. & Eng. Ency. of Law, vol. 18, pp. 379-380.) In this latter work it is said: "The use of the premises by a sub-tenant for an illegal traffic avoids merely the sublease. It is otherwise, however, when such illegal use by the subtenant is with the consent of the lessee."

The testimony in this case showing beyond question even if appellant had sublet the premises to Gurdy and Gurdy was in control of the premises, the illegal use of the premises was with the knowledge and consent of appellant, consequently neither appellant nor Gurdy could assert any legal right under the lease in law. The lease of each of them, if genuine, had been rendered void by the illegal use of the premises, and the owner of the building would be liable to prosecution for permitting his premises to be so used, when done with his knowledge, and a lease contract would be no protection to him subsequent to the time it was shown he had knowledge that the property was being used for the illegal purpose. In his dissenting opinion in the Austin case, 61 Texas Crim. Rep., 573, the presiding judge so announced the rule, saying: "If the owner of the house rents it to another, and the house is used for gaming purposes, when the renter did not rent it for that purpose, and he ascertains that his house is being so used, and he thereafter permits the gambling to go on, he would be guilty of permitting his property to be so used." In his opinion in this case our presiding judge says that was but *obiter dicta* in that case—that the question was not involved in that case, and he used the expression only by way of argument. We agree with him that in that case the question did not arise and was not passed on by the majority of the court, and further, that

he may have intended to use it only by way of argument, but in using the expression he announced the correct rule of law, since the adoption of article 573, and the cases quoted by him in his opinion in this case on that point are not the law of this State, since the adoption of that provision of the Code. And while, as he says, it was announced in a dissenting opinion, yet we want to say that we concur with him that such is the law, and I am authorized to state by Judge Prendergast that he also concurs therein, and such is declared to be the rule of law in this State in this character of case, and the fact that he has leased the premises will be no defense to the owner, where it is shown that he knows of the illegal use of the premises and thereafter continues to permit it to be so used.

The lease, under the law, having been rendered void by their acts, and appellant nor Gurdy being able to assert any legal right thereunder, the sole question would be, who was in possession of the premises? Judge Prendergast has so fully digested the evidence we do not deem it necessary to do so, but merely state that it shows almost beyond question that appellant was in possession and control of the rooms used for gambling purposes, but if it could be said that there was some slight testimony that Gurdy was in control of the premises, such as that he once had a lease that covered it (which the testimony of his clerks would refute), yet it is so slight and inconsequential that a failure to charge thereon would not and should not result in a reversal of this case, and I concur in the opinion of Judge Prendergast on this question, and the opinion of Judges Roberts and Hurt copied therein and cited, and if these were the only questions in the case, I would concur in its affirmance.

However, in bill No. 6 it is shown: "Now comes W. T. Strong, defendant in the above entitled and numbered cause, and shows to the court that the indictment herein in this case against him was returned into this court by the grand jury of Dallas County on the 7th day of February, A. D. 1912. That the names of the witnesses on whose testimony said indictment was found are not endorsed upon said indictment; that the defendant, through his attorney, R. B. Allen, had requested the prosecuting attorney to endorse upon the indictment herein the names of the witnesses upon whose testimony said indictment was found, and whom the prosecuting attorney expects to use against the defendant upon the trial of this cause, or to furnish defendant, or his counsel, with the names of said witnesses. That the prosecuting attorney, Currie McCutcheon, Esquire, has refused and still refuses to disclose to the defendant, or to his counsel, the names of the witnesses upon whose testimony the indictment herein was found, or whom he expects to use against the defendant upon the trial of this cause, and has declined and refused, and still declines and refuses to endorse the names of any such witnesses upon the back of the indictment herein.

"This defendant says that he does not know the names of the witnesses upon whose testimony this indictment was found, and that he

does not know who his accusers are, and does not know the names of the witnesses who will testify against him in the trial herein, and does not know what said witnesses, if any, will testify upon the trial of this cause. That the refusal of the prosecuting attorney to endorse the names of said witnesses upon the indictment herein, or to disclose the names of said witnesses to the defendant, or to his counsel, is in violation of article 432 of White's Code of Criminal Procedure of the State of Texas, and is unlawful, hurtful and prejudicial to the defendant herein, for the reason that defendant will be unable to properly prepare to meet and defend himself against the charges contained in said indictment without having some knowledge as to who his accusers are and upon whose testimony the indictment herein was found; that if any witness or witnesses shall testify to the hurt or prejudice of this defendant upon the trial of this case, he will then have no reasonable opportunity to rebut the testimony of such witness or witnesses by securing the presence of any other witnesses acquainted with the transaction in question, to testify as to the truth with reference thereto, and will have no opportunity to prepare to impeach the testimony of any witness or witnesses who may testify to any fact or facts that are hurtful or prejudicial to him; although defendant verily believes and alleges the fact to be, that if the names of said witnesses are now endorsed upon the indictment herein against this defendant, that he, the defendant, will be able upon the trial of this cause to prove the falsity of any testimony which may be given upon the trial incriminating the defendant, and will be able to impeach any witness or witnesses who may testify to any fact or facts incriminative of the defendant."

The bill further shows that the indictment in this case was returned on February 7th, and shortly thereafter this motion was filed, properly sworn to by appellant, when it was overruled by the court. This was done some two weeks before the cause was set for trial, and again on March 13th, the day of the trial, the appellant renewed this motion, and it was again overruled by the court. In approving the bill the court states: "The court in this and other gambling cases thought it proper in the light of experience to refuse this request—in the interest of the enforcement of the law. This motion was filed and put on motion docket and overruled March 7, 1912, when case was called, counsel called court's attention to this and asked if that ruling still stood, to which I replied, 'It does.' If they had asked it I would have, as I did in other like cases *after announcement by both sides,* required State and defendant to furnish each other with list of witnesses." Thus it is seen that the names were purposely omitted from the back of the indictment; that appellant timely requested the court to have the county attorney endorse their names thereon, which request was refused, and again before announcing for trial renewed the request, which the court says he intentionally refused until after an announcement of ready for trial had been made. After announcement of ready for trial, what time has a defendant to prepare his case for trial? Article 444 of the

Code provides: The attorney representing the State shall prepare all indictments which have been found by the grand jury with as little delay as possible, and when so prepared, shall deliver them to the foreman, who shall sign the same officially, *and the attorney representing the State endorse thereon the names of the witnesses upon whose testimony the same was found.* (Italics ours.) Why were those words placed in the Code? Has a trial judge or any judge the right to ignore the law when called to his attention timely? In construing this provision of the law in upholding the hands of the officers of the law, this court has gone far. It has held the provision directory and not mandatory, and that it does not effect the validity of an indictment; it has held that if a defendant waits until his case is called for trial to call the attention of the court to the failure to comply with this provision of the law, it comes too late, and will not be ground for a continuance. But we fail to find any decision of the court holding that if the request is timely made this provision of the law should not be complied with. What right has this court or any other court by construction to absolutely nullify this plain provision of the law? To uphold the action of the trial judge in this case would render its provision absolutely nugatory and this we can not get our consent to do. It may be that this appellant is guilty, and from the testimony adduced on this trial we are inclined to think he is, but we do not think to secure his conviction and confinement in the penitentiary any court has the right to absolutely override the law of the land. Our Constitution has provided that the accused "shall have the right to demand the nature and cause of action against him, and have a copy thereof," and in Harris' Texas Constitution, from page 85 to 89, will be found a long list of authorities upholding that provision of the law. Our Code has provided that he has a right to know the "names of the witnesses upon whose testimony the accusation and cause is founded." These are rights given him by our law, and the courts have as much right to ignore and nullify one as they have the other, and if that day ever comes in this State, no man will be safe nor secure in his life, liberty or possessions. While the courts and all good citizens want to see the law upheld and enforced, we for one do not want to see the day come when men will be sent to the penitentiary on the testimony of witnesses of whose credibility and truthfulness the prosecuting officers have so little faith that they are afraid for their names to be known for fear that they may be debauched and bribed or persuaded to give perjured testimony. All men who commit crime should be punished and held to strict accountability, but no citizen should be deprived of his life or liberty, branded as an infamous criminal, upon testimony that comes from so questionable a source as the State is afraid if the source is known it may be polluted or proven to be polluted if given time. Without wishing or intending to reflect on any witness in this case, such conduct would raise at least a suspicion that the State itself did not have that faith in the truthfulness

and integrity of its witnesses that ought always to be manifest before another's good name is taken from him.

In another bill of exceptions it is shown that James Riley, a witness for defendant, had testified he was a clerk at the hotel, when the following proceedings were had:

The Court: "You say you never were up there in that poker room unless you were drinking?"

A. "As a general thing."

The Court: "I know you well enough to know you can understand me. Were you ever up there unless you were drinking?"

A. "Yes, I may have been."

The Court: "Do you know?"

A. "I have been up there and played poker."

The Court: "Did you ever play poker?"

A. "Yes, sir."

The Court: "Did you gamble there for money?"

A. "Yes, sir."

The Court: "All the time you have been paying money, paying rent to Strong?"

A. "Yes, sir."

This witness had testified to gambling in the club room, and what object and purpose the court had in having the witness confess he gambled there while sober as well as when drunk we are at a loss to understand. But if he had stopped there we, perhaps, would hold it harmless error, but when the court emphasized appellant's connection with the matter, it can be readily seen how harmful it would be. We agree with what is said in the Testard case, 26 Texas Crim. App., 260: "Wisely, we think, the law vests a trial judge with a broad discretion— to direct and control the introduction of evidence and the examination of witnesses," etc., but the court in so doing should never so conduct himself as to impress upon the jury his opinion as to the guilt or innocence of a person on trial. The last question propounded by the court to this witness would necessarily create in the minds of the jury an opinion that the judge thought appellant guilty.

Attached to the motion for a new trial are the affidavits of two jurymen, E. L. Greenwood and Sam E. Cannon. Mr. Greenwood swears that he had been voting for acquittal of appellant on each and every ballot, when on the second day the jury was out Mr. Cannon came to him and told him about being on the Warren Diamond jury, which failed to agree, and after the jury was discharged that Diamond entered a plea of guilty. The affidavit goes into detail and shows that Diamond was prosecuted also for operating a gambling house, and Greenwood says: "That affiant had no knowledge of the Warren Diamond case nor had he ever before that time heard of the same, but after the above mentioned statement had been made by the said juror, Sam Cannon, affiant realizing that said juror was under oath was by such statement made by said juror induced to finally agree to a verdict of conviction

in this case; that said statement influenced affiant by reason of the circumstances aforesaid to agree to a verdict of conviction and affiant would not have so agreed if said statement had not been so made." Cannon in his affidavit says what Greenwood says is true, and that he did convey him this information, and used this argument with the juryman. Each of these matters, when taken separately, may seem to be trivial in their nature, but when considered together are of that nature that no conviction thus obtained should be permitted to stand. Therefore, I concur in the opinion reversing and remanding the case.

PRENDERGAST, JUDGE (dissenting).—On February 7, 1912, appellant was indicted and convicted of violating our gambling law, and his penalty fixed at two years confinement in the penitentiary, which is the lowest penalty.

There are several counts in the indictment, only two of which were submitted to the jury for a finding. The jury, by its verdict, found appellant guilty under the second count. So that it is necessary to consider this count only in passing upon the questions raised in this case.

Said count, after the usual formal parts thereof, is as follows: "That one W. T. Strong on the 15th day of October, in the year of our Lord One Thousand Nine Hundred and Eleven, with force and arms in the county and State aforesaid, did then and there unlawfully and knowingly permit a certain building, room and place, which building, room and place, was then and there under the control of the said W. T. Strong to be used as a place to bet, wager and gamble with cards, and as a place where people resorted for the purpose of betting, wagering and gambling with cards against the peace and dignity of the State."

A motion was made to quash this count of the indictment on various grounds. I think it unnecessary to state them as all of them have heretofore and repeatedly been passed upon by this court and said count in substance and in effect has been held amply sufficient. Rasor v. State, 57 Texas Crim. Rep., 10; Santos v. State, 65 Texas Crim. Rep., 518, 146 S. W. Rep., 919; Davis v. State, 151 S. W. Rep., 313; Robertson v. State, from McLennan County, recently decided, but not yet reported. And the vagrancy Act did not repeal said gambling law. Parshall v. State, 62 Texas Crim. Rep., 177.

In order to discuss and decide appellant's other assigned errors, it is proper, if not necessary, to give at least a synopsis of the evidence.

The evidence is practically undisputed and uncontradicted on every issue in the case. Some witnesses testify to certain facts seen and known by them, while other witnesses testify to others. But practically and actually there is no contradiction and contested issues by one witness or set of witnesses testifying to a given state of facts, and another the reverse thereof. One witness may know and state more than another witness knows or states.

The building, room and place in which said gambling was alleged to have been permitted by appellant, belonged to H. L. Edwards. On

May 17, 1910, Edwards, by his agent, W. Leslie Williams, entered into a written lease with appellant whereby he leased to appellant "the second and third floors of what is known as Nos. 313 and 315 Main Street, City of Dallas, for the term of two years from the first day of January, 1911, to be occupied *as rooming purposes and not otherwise."* Appellant was to pay $200 per month in advance on the first of each month. This lease, among other things, expressly provides, "that no improvements or alterations shall be made in or to the hereby demised premises without the consent of the lessor in writing." Also, "the lessee shall not assign this agreement or underlet the premises or any part thereof . . . or make any alteration in the building or premises . . . without the consent of the lessor in writing; or occupy, or permit or suffer the same to be occupied for any business or purpose deemed extra hazardous on account of fire." Also, "that in case of default in any of the covenants, the lessor may declare the lease forfeited at his discretion, and his agent, or attorney shall have the right to re-enter and remove all persons therefrom." . . .

Said Williams testified: "At the time the lease was made or shortly afterwards, I think the day after the time when the lease was made, he (appellant) asked me to change the wording in the lease in regard to the subletting of the building, and I refused, but I gave him permission verbally that he might sublet the building according to the conditions of the lease for things that were not any more hazardous by fire. I told him that it did not make any difference about him subletting the building, but that I would not release him from the lease; I told him if he did sublet it, I would look to him for the money, that I would not release him from the liability."

The evidence, without contradiction, and without doubt, shows that for every month after said lease became effective appellant paid to the owner's agent the $200 per month in advance as fixed and agreed in said lease and that no other person paid to the owner or his agent for him said rent at any time.

*Was said building, room, or any place therein, used as a place to bet, wager and gamble with cards, or as a place where people resorted for the purpose of betting, wagering or gambling with cards?*

J. D. Robinson, who was, and for about fifteen years prior to the date of trial, in the real estate business, testified: "I know where the Astor hotel is located. I have been there. I have played two or three games up there. It was a poker game, played with cards and chips. I could not give the dates—I can give two dates, the 13th of October and the 12th of December, 1911. I think I have been there more than those two times, but I don't remember the times. The hotel lobby is on the second floor and this was on the third floor in front. . . . The poker room was on the third floor. In order to get up in that room you go through the hotel lobby up through the hall to a stairway in the rear that led up to the gymnasium and through that into a club room and rang the bell, and somebody let you in; sometimes it was a

white man and sometimes it was a negro—a negro mostly. There was a hole through the door and through which he peeped before he would let you in. He opened the latch and looked through and opened the door to see who was there and then he closed the door. They always had two or three runners and spotters to tell you about those places." He then testified that he sometimes went up there alone and at other times with another, but always went in the daytime. "There was every imaginable thing for manual exercise up there, and there was a pool room, and not far from that was where the poker room was cut off. There were only two rooms up there, a big lobby room, the exercise room, and the poker room. I think they had my name as a member of that club. I never did join the club and never paid any dues as a member of the club. . . . The room that was cut off in front, where the game was, was about twenty or twenty-five feet square, with a door leading into it from the gymnasium. When I first went up there to that room I found a couple of tables and men sitting around the tables playing poker. They were round tables, fixed like poker tables usually are. They had some soft material on it and then a white cloth spread over and tied around that. . . . There was always somebody to take out every time. Yes, the take-out is the same as the kitty. Generally they had a man in the game to take off every time there was a deal, and when the pot was opened I think they took out two chips; that is, I think they took out every time, two and one chips, I believe. . . . They had five-cent chips. Yes, I think there was a fifteen-cent take-off out of every pot. I think I bought my chips on every occasion from Jim Cornwell. I don't think generally anyone bought less than ten dollars' worth. Yes, it was a ten-dollar change-in. I saw very few people there in these poker games that I knew. You know, in open poker games you can't remember who is there, they are coming and going all the time. I never stayed up there long, not over two hours or two and a half hours at any time." . . . The witness then named five different persons whom he saw up there and played with, and said: "I could not possibly study out and remember who they all were." He then again states that there was a take-off in every game he played and he thought Billy McNeill did the taking off. "The chips were not all nickel chips. They usually had red, white, blue and yellow chips, worth five cents, twenty-five cents, a dollar and a quarter and six dollars and a quarter, I think. I think the yellow chips were worth twelve and a half."

Jack Ware, a druggist, who lived in Dallas, but was formerly a traveling man, and who knew appellant and said hotel and its location, testified that he had been up there and played poker in the fall of 1911. "I was let in at the door, and went there alone at first. When I got up there I knocked at the door and a porter let me in and I just went up and took out a stack of chips and went to playing poker. . . . I played poker up there several times, I don't know how many. I stayed there several hours, I could not say positively—a good time."

R. P. Keith, who was a city grocery salesman, formerly chief of police of Dallas, testified that he knew where said hotel was located and had been up there and ·played poker. He couldn't remember whether a negro or a white man let him in. He was not a member of any club there. "When I went in there I went over to the table where they were playing cards and I played. I never played but one time, possibly a couple of hours. I know some of the men I saw up there." He named some persons who were up there, but couldn't remember all who were in the game; that there was a take-off. He thought Tight Boy was taking off and he couldn't remember from whom he bought chips. He won in the game and when he cashed in, Jim Cornwell cashed the chips he won.

J. W. Blakey, who was engaged in the wholesale lumber business, knew appellant and the location of said hotel; that he had been on said third floor and played poker for money there. "I could not say how many people were there,—possibly eight or ten." They played for chips which represented money; he didn't know from whom he bought the chips; he usually bought five dollars worth. "I have played poker up there five or six times. The longest I ever played there was for four or, five hours, something like that." He then named several people whom he knew that he saw playing poker up there. Others, he could not remember their names.

S. Koenigsberg, a merchant tailor of Dallas, who had known appellant for about fifteen years and had been to said hotel on the third floor, had played there prior to February 7, 1912; he couldn't remember but one man, he named, who played. He went alone and surmised there was a poker game there. He bought ten dollars worth of chips from Jim Cornwell and played about thirty minutes. He went back there a month or two later, after his first trip, and played again. He was not a member of the club.

R. W. Sheegog of Dallas, and who was a printer, knew appellant for about five years, and the location of said hotel. He had been in it on the third floor about two months before this trial. "I played poker up there for money several times. I played poker up there with cards for money several times, four or five times, I am not sure." He named five other men who were up there at the time, but couldn't think of others who were there. He bought chips from Jim Cornwell, and Cornwell cashed them when he quit. Sometimes he won, and sometimes he lost. They had a take-off in the game. They pinched the pot.

Abe Castleman, who was an ex-farmer, and who lived in Dallas County, knew appellant six or seven years, and knew the location of said hotel; he was up in said poker room before the fair in 1911, and afterwards also. "I was there several times along during the fall. I have played poker in the club up there in the front of the club. Yes, we played for money and there was a take-off. We played with cards. A fellow by the name of Cornwell sold me the chips and the other players generally cashed them. I saw several different persons there play-

ing poker; I don't know just who all I did see. I can not say how many times I have been up there, I expect about fifteen times."

Frank Markham, who was engaged in the lumber business, knew appellant and knew the location of said hotel; had gambled in the third floor prior to February 7, 1912. He couldn't state the exact dates, but it was probably along in December, 1911. "I was up there during the months of October, November and December, 1911, several times, probably fifteen times. I usually played poker when I was there." He bought chips from Jim Cornwell sometimes and couldn't remember that he bought them from anyone else.

Gus DeLee, who was in the furniture business in Dallas, and who knew appellant some twelve or fifteen years and had sold him groceries when he first knew him, knew the location of said hotel, further testified: "I have been there and have played poker there for checks. I paid money for the checks. I played poker with cards there. Yes, I know what a take-off or kitty is. I am reasonably sure that there was a take-off in those games. . . . I paid money for those chips but I don't remember the amount. I stayed in the game probably an hour at a time."

Hicks Barksdale, who was in the wall paper and paint business, knew appellant for several years, and knew the location of said hotel, and had been upon the third floor, further testified: "I have played cards up there for money. We used to put up the money and play poker, that is all. Yes, they had a take-off in the game. . . . I don't know how many times I played cards there for money, eight or ten times, or a dozen times."

Allen Daly, who was a traveling salesman and knew appellant for ten or twelve years, had been to said hotel and played cards there for money, further testified: "I have played poker up there; I suppose five times would cover every time I was up there." . . .

A. B. Kirkpatrick, who does not state what his business was, testified that he played cards there for money at different times from the middle of June to about the middle of November of 1911. "I do not know how many times I have played there for money, perhaps half a dozen or a dozen times, I could not tell."

T. B. McNeill, who didn't state what his business was, but that he knew appellant when he saw him, had been on the third floor of said hotel building, had played poker there for money with cards. He didn't know how many times, but several times,—fifteen or twenty times, both in daytime and at night. He didn't know the man's name that sold him the chips, nor the man's name who cashed them in.

Max Miller, who was a bartender, and knew appellant three or four years, and had lived in Dallas eight years, knew where said hotel was, and during the year 1911 had played poker there with cards. He sometimes played with a five-dollar stack and sometimes two-dollar. He bought chips at different times, once at least, from Jim Cornwell, who cashed some, and others also cashed some. He played with different

partics up there, naming some of them, but didn't know or remember the names of all of them.

E. L. Sayers, a policeman, and who knew appellant and the location of said hotel, was one of the officers who made a raid on said poker room in February or March, 1911, and found seven to nine men up there, and as they kicked in the door and effected an entrance, these men rushed away from said poker table.

D. G. Midgett, whose business was not stated, but who knew appellant and the location of said hotel, further testified that he had been there and played cards for money. "It would be hard to answer how many times I have gambled there with cards, I expect thirty-five."

Joe Brown, who was a grand jury bailiff and deputy sheriff and knew appellant and the location of said hotel, testified that he was one of the officers that made said raid on said place, and arrested up there from six to ten men for gambling there.

Dr. W. B. Jackson, who was a practicing physician and had been practicing about seventeen months, and knew the appellant and the location of said hotel, further testified: "I was up there in 1911. I played poker with cards up there for money several times—thirty times, I suppose. I have played both in the daytime and at night. I bought some chips from Jim Cornwell. The longest I have played there was six hours. Yes, I have been there at night and also in the daytime. There was a take-off in that game. I don't remember who looked after the take-off; I would not know their faces if I should see them." . . . On cross-examination: "I think the first time I went up there was in the spring of 1911, I can't designate the month. The last time I was up there was the latter part of the fall of 1911, I expect about October, 1911. Between the spring and fall I was up there something like thirty times. Yes, I think I was in the game each time I was up there. . . . I got my chips from Jim Cornwell; I very seldom had any to cash in; if I happened to be lucky enough to cash in Jim Cornwell cashed them for me every time I was there."

R. Keller, who was in the pool and billiard business five years, and knew appellant that length of time and the location of said hotel, further testified: "Yes, I have been up there on the third floor and have gambled there with money and for the purpose of winning, with cards. We were playing poker. I can not say definitely how many times I have been up there, fifty times I suppose. Yes, I know what a take-off or kitty is. Yes, they had that there. A man by the name of Johnny Strong and a man by the name of Page took that." On cross-examination: "Yes, I think I may have been up there perhaps fifty times, I don't know exactly how many times. I played cards up there in the room fronting on Main Street in the third story of the building a number of times between May and January."

W. T. Pace, an attorney at law, who had been practicing about eight years, and knew appellant for about fifteen years and where said hotel was situated, further testified: "I have been on the third floor of that

building many times prior to the seventh day of February, 1912. I have played poker with cards for money there. I could not say how many times, approximately, fifty. I suppose at least half a dozen men sold me chips. A man by the name of Page and a man by the name of Cornwell, and some big fellow from down in East Texas somewhere, Terrell, I think; I don't know what his name was, and a barber in town by the name of Bill Ramsey. These are the men that delivered the checks. I am under the impression that Cornwell took the money. These are the men that waited on me at the table; Cornwell was the man that finally got the money I had to pay for them. They turned the money over to Cornwell. Yes, I know what a kitty is, I have seen a few in my life. Yes, I have seen one in that game. Yes, I know what a take-off is. There is quite a difference in a take-off and a kitty. A take-off is where a certain per cent is taken off of each pot, according to the hand you hold and the hand you fill."

T. A. Riddle was a police officer and sergeant of the police force, knew appellant ten or twelve years, and the location of said hotel. He was one of the officers who raided the said gambling or poker room with said Sayers and others. They had to kick the doors open to get in and then saw some men sitting at the table; they commenced running and kicking the chairs over. There were nine men, all told, up there and they arrested and locked up five or six of them for gambling up there. Two men got away. Some of those men were well known citizens and had been in Dallas quite a while.

Dr. Whatley, who did not otherwise give his business, had been up in said gambling room and gambled there two or three times with cards. The last time was before Christmas, probably in November, 1911. When he went up there he was looking for a poker game and got it. Johnny Strong was there at the time.

J. T. Lynch, who was night captain of the police department at Dallas, knew appellant and the location of said hotel. He was one of the officers who raided said gambling room about April 21, 1911. It was at night and after 9 o'clock. They had to break in; that they found several men in the poker room and found therein a lot of stuff, cards, chips, paraphernalia and chairs.

Ed Vaughn, who was in the advertising business, a resident of Dallas, knew the appellant and the location of said hotel; some time about August, 1911, he played cards in said poker room two or three times. He didn't join the club. He was told by a man with whom he went up there that they were playing a little poker and he went up there himself and played.

Henry Hamilton, an insurance man, who had lived in Dallas thirty-nine years, knew appellant; he was in the club rooms on the third floor of said building when it was raided by said officers. There were four men in the room when he went up. They were sitting around the table

playing cards of some kind; he didn't notice to see what they were doing. He saw no gambling up there but that card game.

Jim Riley, who lived at and was a clerk in said hotel since February, 1911, testified that he had been in said club and poker rooms, and further: "I may have·been there fifty times, maybe more and maybe less. I would estimate it at twenty-five times. I could not say whether there was a take-off in the games up there or not. Yes, I know what a take-off is. I don't know what the take-off would be the times when I went into the room where the game was. I don't play cards unless I am drinking. . . . As a general thing I was never up there in that poker room unless I was drinking, I may have been. I have been up there and played poker. Yes, I gambled there for money."

The above are all the witnesses who testified about the gambling in said poker, or gambling room on the third floor of said building.

*Who furnished and who owned the gambling paraphernalia and what gambling paraphernalia was there in said gambling or poker room?*

This case was tried on March 15, 1912. Said Attorney Pace, whose testimony on one point is given above, further testified: "I saw Billy Strong (appellant) on the third floor of that hotel at one time. That must have been over a year ago. He was buying some furniture for the third floor and had Sanger Brothers' man up there. I never saw Mr. Strong in the gambling room at all. I never saw him buy any upholstery for the poker room, or any furniture. At.that time there were three or four different men up there, furniture men and otherwise. I know Sanger Brothers had a man up there and the Strickland Furniture Company had a man up there. I know these men were up there, and I know that some time afterward I went up there and the house was furnished, but who bought it I don't know. Mr. Strong was with these gentlemen up there. They were furniture people and I suppose they were talking about selling and buying furniture. I did not stay close enough to listen."

Said Barksdale, whose testimony on one point has been given heretofore and who was in the wall paper and paint business, further testified: "I never had any conversation with the defendant about the club up there about papering it. There was a paperhanger by the name of Smith that done the work and he bought the material from me and had it charged to Strong. Mr. Strong paid the bill. I think that was in the neighborhood of a year ago. Yes, that was the defendant, W. T. Strong. I do not remember how much the bill was." On cross-examination: "I think the material for painting and papering was purchased about a year ago. I think it was about the latter part of January or February or the beginning of February, 1911."

Said Robinson, whose testimony on another point is given above, testified: "Yes, I had a talk with him (appellant) about the time they opened up and Billy (appellant) told me they had a nice little business man's game up there. Billy Strong told me that. That is about his

language, that they had a nice little business man's game up there."
That conversation occurred about the time they opened the hotel.

Said police officer, Sayers, whose testimony on another point is given
above, further testified: That a raid on said poker or gambling room
was made in the spring of 1911; he couldn't give the month but thought
it was in February or March. Taking the testimony of all the witnesses
on this point, it establishes that this raid was made in the early spring
of 1911. Said Sayers further testified: "We went in where they were
in this room and found a lot of poker chips in there and cards. As
well as I recollect there was a deck of cards on the table and a lot of
chairs around the table, and a box out of which we got two or three
checks and a dollar. We taken the box and the table and chairs up to
the City Hall. There was one big round table. It had a white cover
with a blanket under it. There was a deck of cards scattered on the
table and we found several other decks there on the desk. There was
a hundred and three or four decks of cards, as well as I recollect, about
fifteen hundred poker chips, and a box that had some greenbacks in it
and a couple of checks and a watch. Those things were in a desk that
was in the same department in the same room where the table was.
That is about all that we found there, and we carried it all to the City
Hall. We loaded it on a wagon in the back alley. No, Mr. Strong
was not at that place. Yes, he did come up there afterwards; I could
not say exactly how long after we raided the place it was, but it was
some little bit; maybe it was a half hour or three-quarters of an hour.
When I saw him I was in the room where these people was. The table
was just like I said. When Mr. Strong came in there were three or
four talking and I was standing at the door, and I heard Mr. Strong
say that it was his stuff, and he didn't want it taken out, and if it was
taken out he would get it back. I am sure that he said it was his stuff,
and that if they took it out he would buy it out or take it out or get
it out, or something of that kind." All the witnesses establish that
this was at night some time between 9 and 10 o'clock.

Said officer Brown, some of whose testimony has been given above
and who was one of said raiding officers, further testified: "He (appel-
lant) said to Riddle that he was going to replevy the furniture and
stuff they were taking out. He said he was going to replevy it and
Riddle said he could."

Said Riddle, one of said officers, whose testimony on one point is
given above, further testified: That after they made said raid on said
gambling or poker room, appellant showed up there before they got
away, and when they were taking the gambling paraphernalia, chairs,
and table, "Mr. Strong (appellant) said, 'I don't care how many you
take, I am going to replevy them.' I said, 'That is what we want you
to do.' We went down the back stairway with the stuff, and sent it
to the City Hall, and gathered up the chips and cards and what money
there was. Mr. Strong (appellant) was complaining about tearing the
cards up. I said, 'We have a warrant,' and he said, 'I have nothing

more to say if you have a warrant.' "  He further testified that he could not tell for certain the time intervening between the arrest of those parties on this occasion and the time of the appearance of appellant on the scene.  He said: "It was not but a short while though, fifteen or twenty minutes.  My understanding is Mr. Strong lives on Canton Street, about seven or eight blocks from the Astor hotel."  Further, on redirect-examination, he said: "Yes, sir; I looked at the kitty.  It had forty-five poker chips in it, that is all I seen.  I saw some bank checks; I could not say who they were made out to."

Said Lynch, one of said raiding officers, and whose testimony on one point has been given above, further testified:  "We went over there to the front room and there were several men in there, and there was a lot of stuff, cards and chips and paraphernalia and chairs.  We carried the cards and chips up to the City Hall.  I saw the defendant there a few minutes later; I only stayed a few minutes.  He told them to take the stuff out, that he would replevy it.  I think there were over a hundred decks of cards and about sixteen hundred chips; I only counted them at the office; took them up there and counted them."  On cross-examination: "I stayed there only about twenty minutes.  Mr. Strong, the defendant, came in before I left.  I had not gone when he got there. They were carrying the tables and chairs out and I heard Mr. Strong say that he would replevy them."

Each and all of these four officers, Sayers, Brown, Riddle, and Lynch, in substance, testified that they made said raid with a search warrant and when they got up to the loor leading into said gymnasium and poker or gambling room, that they took the hotel clerk along with them and demanded from him that he open the doors; that he stated to them that he didn't have any key and couldn't open the doors and that they thereupon broke down the doors and forced an entrance into said gambling or poker room.

*Who had knowledge that gambling was continuously going on day and night from about February 1, 1911, until the indictment was filed in this case on February 7, 1912, and who had control of said poker or gambling room?*

In addition to what has been shown above by the uncontradicted testimony to the effect that appellant had rented from the owner of said building the second and third story thereof and that in the lease that it was expressly *"to be occupied for rooming purposes and not otherwise"*; and the further fact that it was continuously used as a gambling room and resort for that purpose for the full period of time from about February 1, 1911, until the filing of the indictment herein; and that appellant had told Mr. Robinson, about the time they opened it up, *"That they had a nice little business man's game up there"*; and that in effect appellant had bought gambling paraphernalia and furnished said poker or gambling room himself for that purpose; and that in the early spring of 1911, when the officers raided said gambling or poker room, that he then claimed all of the gambling paraphernalia therein as his

own and said that he would replevy it when they took it out and did so; let us go further and see what further facts the uncontroverted evidence clearly established.

Nearly every witness who testified in the case and nearly every one of said witnesses who testified they had been up in said gambling or poker room and had gambled frequently therein, and the three hotel clerks, W. A. Perry, L. H. Dymock, and said Jim Riley, testified that appellant kept his desk on the second floor of said building and in the hallway thereof, leading from the front entrance to said hotel to the back stairway, the only entrance to said gambling or poker room; and where he must necessarily see and know every person or approximately so, who went up into and down from said gambling department. There was no testimony, either direct or circumstantial, that disputed this.

Said witness Sheegog, whose testimony on another point is given above, further testified that there was a phone in said poker room. "I think I saw Mr. W. T. Strong in the gambling room there once. I did not see him but one time, use the phone. I don't think there was any game there in progress at that time. I went in there to play and we were just waiting for a game. I know Cornwell, an old, bald-headed man. Strong came up and spoke a word or two to Cornwell and went out. . . . I could not say definitely when I saw Strong in there using the phone, it was since the fair in 1911 and prior to January the 12th (1912)." On cross-examination: "The last time I was up there was about a month and a half or two months ago. The time I spoke of seeing Mr. Strong come in, he just came in and spoke a word or two to Mr. Cornwell and walked out."

Said Daly, whose testimony on one point is given above, further testified that when he was up in said poker room where he played poker, "I saw Mr. Strong up there one time. . . . I never saw him in the card room but one time and that was one night about 8 or 9 or 10 o'clock maybe. That was in the poker room. There was a poker game going on and he come in there and broke up the game. He just come in and says, 'Cash those checks and break up this game,' or words to that effect. Yes, the game was broken up then. . . . There may have been five or six or seven men playing up there. We had been playing quite a while, possibly two or three or four hours maybe. Mr. Strong just came up there and said, 'Break up this game,' and he and his brother Johnny came near having a fight about it. Johnny didn't want to break up the game. I tried to get in between them, but I said, 'Those fellows are brothers and if they want to fight they can go ahead.' I don't know just when that was; it was along about Christmas of last year, something like that. It may have been the first of the year. Johnny Strong was drinking." (From the whole record, doubtless appellant's breaking up this game at this time was because he had an intimation or fear that another raid by the officers was about to be made.)

Said witness Miller, whose testimony on another point is given above,

further testified: "I seen Mr. Strong (appellant) in the Astor hotel in the top part where they play cards. That man there (indicating the defendant), I saw him twice, once he was playing cards and once he was talking to somebody. I can not say whether there was a game in progress at the time he was there talking to somebody or not. It was in November, 1911, that I saw him there; I think it was in that month, I am not positive."

Said Midgett, whose testimony on another point is given above, further testified that he was up in that gambling room on the night that Martin W. Littleton was there and that just as he was going out he met the appellant going therein.

Said Jackson, whose testimony on another point is given above, further testified that at some time when he was gambling up there. "Yes, I think I saw the defendant up there perhaps once or twice. No, I don't remember when I saw him there. No, I don't think I have ever seen the defendant play up there." On cross-examination: "Yes, I think I saw the defendant up there once or twice while I was there, but I won't be certain about it. I don't recall any of the circumstances of seeing him there. I have often seen him in the hotel."

Said witness Keller, whose testimony on one point is given above, and who testified that he had been up there and gambled fifty times, further said: "Yes, I have seen the defendant up there just a few times. I think the game was going on when he was there. The only thing I remember seeing him do was to come in and go out one time—twice I saw Mr. Strong in the back room looking over books, and reading papers; I don't know what kind of book. That was not the poker room, that was in the room in the back behind the gymnasium. They have doors between them, but the doors are always open. I don't remember the date when I saw him there. That was between the last of May (1911) and the first of January (1912)." On cross-examination: "I am under the impression that I saw the defendant up there several times, two or three times. I saw him in the. rear looking over a book and reading the paper, and in the front, too, in the poker room. I don't know the date. I saw him there two or three times altogether. I think I saw him in the club room twice. No, I never saw him playing cards there. I seen him come in and go over to the desk. I was playing and didn't pay much attention to what he did. I don't know who else was present. I don't know what time it was. I could not name any of them. I was playing. No, he was not playing with me. I could not tell how many there were there when I saw the defendant there. The game was full all day; we had six or eight men playing all the time. I don't know how many men were playing cards when the defendant came in; I suppose six or eight. I can't name any of them. Jim Cornwell was there and Johnny (Strong) ; I don't know who else was there. No, I am not naming those two men because they are not here. I can't state anybody else positively, because I could not remember dates. I saw him (appellant) and Johnny go into the safe to arrange some kind

of change." He said this was some time in the fall of 1911; that he had not been there since January 1, 1912. On redirect-examination: "Yes, I have heard Mr. Strong make statements; I would say, 'How is business, Billy,' and he would say whether it was good or bad." ·

Dr. Whatley, whose testimony on one point is given above, further testified: "I know where the gymnasium is up there. I don't know that I have ever seen the defendant in the gambling room up there. I have seen him in the gymnasium a good many times."

W. A. Perry, one of the hotel clerks at said hotel, testified that he saw the safe when it was taken up into said gambling room but that he had not been up there since it was taken up there.

Said Markham, whose testimony on one point is given above, testified that he had gambled up in said poker room many times, and further: "Yes, I saw a great big safe there. Some poker checks were kept in that safe. I never did see any cards, but I saw checks in there. I hardly know how big that safe was; it was about four feet tall and about three and a half feet wide, I guess. Jim Cornwell opened that safe."

*Was said poker or gambling room and said gymnasium room ever a part of said hotel or under the control or management of the clerks thereof, or of any other than appellant?*

Said L. H. Dymock, whose testimony on one point is given above, testified that he was one of three clerks in said hotel and had been there in such capacity since it opened up about the middle of February, 1911, and that Perry and Riley were the other two clerks. He described the hotel and the rooms thereof as follows: "There are about ten rooms on the top floor and eighteen or nineteen rooms on the second floor of the Astor hotel. There are twenty-five rooms altogether, and thirty beds. The floor that the office is on, the second floor, has fifteen rooms, and on the upper floor, the third floor, there are ten rooms. In order to get to the rooms on the third floor you go up an open stairway. On the third floor there is a big hallway between the bedrooms on the west side of the building and the gymnasium and club rooms on the east side of the building. They are entirely separate. The gymnasium is on the east side of the building and the bedrooms are on the west, that is, on the right side as you go upstairs. There is a hallway between them." On cross-examination he said: "Yes, there is a back stairway that leads up to the club rooms. That is not the stairway that leads into the rooming department on the third floor. That back stairway leads up to the gymnasium."

Said W. A. Perry, one of said three hotel clerks, and who testified that he had held the position of clerk in said hotel continuously from the time it was opened in February, 1911, up to this trial, and who testified that a part of said time he had been day clerk and a part of the time night clerk, further testified on cross-examination: "Yes, Mr. Strong, the defendant, has a desk or an office there on the second floor of the hotel. His desk is in the hallway. The second floor is mostly used for rooming purposes; one-half of the third·floor is used for room-

ing purposes and the other half, I think, is the Athletic and Gymnasium Club. Yes, I have been up there. I have never seen the safe up there. I saw the safe when it was taken up there, but have never seen it since. That safe was taken up there some time last summer. I suppose it belongs to the gymnasium club. No, I have never seen the charter of the athletic club. . . . No, I am not a member of that club. *No, my duties have nothing to do with that part of the building that the club is in. When I first went there and was employed to work there I was told that that was a gymnasium club and nobody but members were allowed up there. I had no part or parcel in that part of the building: I let that part of the building attend to itself."*

Said Jim Riley, the other of the three clerks in said hotel testified that he was a clerk in said hotel and had been engaged in that business since February, 1911. "My duties are just like those of any other clerk in the hotel. I keep the books and take care of the rooms. Yes, I am familiar with the situation of the hotel and its rooms and apartments. The Hotel Astor occupies the second floor of the building and the third floor of the building. There are twenty-five rooms in the hotel, fifteen on the second floor and ten on the third floor. There are thirty beds, twenty-five rooms and thirty beds. You enter the hotel from Main Street by going up a stairway to the second floor of the building. At the head of the steps as you enter from Main Street is the hotel office. The stairway leading from Main Street is open. The west half of the third floor are the club rooms, the Dallas Gymnasium and Athletic Club. They have punching bags, pool tables, a gymnasium and baths up there. There are four rooms on the east side occupied by the Dallas Gymnasium and Athletic Club. The main dining room, kitchen, buffet and gymnasium, and at the rear there is the secretary's office. You go up into the club rooms from the rear of the second floor and as you enter you go through the secretary's office, and passing through that you go into the gymnasium, and passing through the gymnasium you enter the buffet and kitchen and then you enter the dining room. That has been the exact situation of the apartments on that side of the house since the first day of February, 1911." On cross-examination: "Yes, the rooms in the Astor hotel are separate from the club rooms. The rooms in the hotel are numbered."

In this connection I refer to the testimony of the witness Robinson above, in describing the said poker room and what was in it. In addition, on cross-examination: "Yes, that poker room is the front room in the southeast corner of the third story of the building. You go up a hallway from Main Street into the lobby of the hotel and then turn to the right and go up a flight of stairs, then you get into the first room, that is the club room. It has a punching bag and different exercise things and a pool room. They have their pool room there and several kinds of gymnasium exercises. There was one table that was for both pool and billiards, an accommodation table, I think. I would not be positive about how many tables there were. There is a small room just

as you enter the gymnasium and then you pass through the gymnasium and get to the card room. The last time I was up there was on the 12th (1911) of December. You go up those stairs to the east and then go around and then go south until you strike the door where the game is. You go in a little passage and this little room and to the gymnasium, and when you get into the gymnasium there is nothing to prevent you going straight to the poker room. Between the gymnasium and the poker room there is a little room cut off where they keep ice and the drinks. I did not go through that room. I was there on the 13th of October and on December 12th (1911). I remember those two dates. I was there before December 12th (1911), but not after that date. The reason I remember those two dates is because I gave checks ,that day. When I got through playing on each of those days I wrote a check. I know that from my stubs."

Said Castleman, whose testimony on one point is given above, further testified: "I am familiar with the arrangement of the third floor there. Yes, as you go through the gymnasium and out of it you pass through a room where there is an ice box on the left, and a kitchen on the right, and from there you go through into the poker room. You have to pass through a room about twelve by sixteen feet, which is situated between the gymnasium and the poker room. As you pass into that room, between the gymnasium and the poker room there is a kitchen on the right, a little kitchen, and then you go on through a door that enters into the room where you play cards. There is also a door between the gymnasium and the room where we played cards. A person in the club room could not see a person in the poker room if the doors were shut. There is an intervening room between them. They generally kept those doors shut when I was there. As you enter the club room at the rear entrance you first go through the secretary's office, then into the club room and then into the little room where the kitchen is, and then into the room where we played poker."

R. A. Stubbs, who lived in Dallas, knew appellant, and testified that he roomed at the Astor hotel on the third floor a couple of months, and further testified: "Yes, I have stopped there at the Astor hotel. . The stairway leads up from Main Street to the second floor of the Astor hotel and there are double doors and the clerk's desk is not quite opposite from the door. There is nothing on the second floor to impede the progress of anyone. In going from the second floor to the third floor you go through a large hall that turns toward Main Street up an open stairway to the third floor. I don't know exactly how many bedrooms there are upstairs on the third floor. There is no connection that I know of between the club rooms on the third floor and the bedrooms on the west side of the third floor. . . . Yes, I have roomed up there on the third floor. When I roomed in a bedroom on the third floor I never knew of anything that was happening in the club rooms. No, there was no access, so far as I know, between the club rooms and those bedrooms. I roomed on the third floor probably a couple of months."

*What was appellant's business and where did he stay and what did
he do?*

All of the witnesses who testified on the subject, and many of them
did, establish without controversy that the only place of business he
had where he stayed and attended to it was his office and desk in the
hallway leading from the landing of the main entrance on the second
floor of said Astor hotel, to the private stairway leading up into said
gambling or poker room.  And that he stayed at that office and place
of business practically continuously from the time he took possession
of said building under his lease contract until this indictment was filed.
It is true several witnesses, when asked what business he was engaged
in, stated in effect that they had heard or understood or were informed
that he was in the gravel business.  Some witnesses testified that he
had a gravel pit somewhere west of the City of Dallas.  Some of the
clerks of said hotel testified that his gravel pit foreman occasionally
came up to see him at said place of business at his office and desk in
said hallway and settled with him, or had business with him there in
connection with said gravel pit.  And that he sometimes there settled
with some of his hands in connection with said gravel business.  But
no witness at any time anywhere testified that he was ever at any time
during said period from when he took possession of said building to
the filing of said indictment at said gravel pit or was ever seen thereat,
or thereabouts.  And in no way was he ever shown to have had any-
thing to do with that gravel pit other than that at his said place of
business and desk in said hallway in said hotel.

Appellant claims to have sublet said hotel to one C. Gurdy, and he
proved up and introduced a rental contract which was signed by him-
self and said Gurdy.  The witnesses who claimed to have been present
and to have seen the parties sign this sublease contract, but neither of
whose names are signed thereto as a witness, said that it was actually
signed by said makers on January 30, 1911.  By it appellant purports
to lease to said Gurdy certain property described as "Lying and being
situated in the City and County of Dallas, State of Texas, and being
the second and third floors of the three-story brick building known as
and located at No. 1401½ Main Street, City of Dallas, for the term of
one year from the first day of February, 1911, *to be occupied as a hotel
and not otherwise,"* Gurdy to pay $250 rent monthly in advance 'to
appellant.  It is among others, "Upon the conditions and covenants
following."  Then provides that no improvements or alterations shall
be made in or to the said premises without the consent of the lessor in
writing.  All improvements to belong to the lessor when the lease
expires.  "6th.  That in case of default in any of the covenants, the
lessor may declare the lease forfeited at his discretion, and his agent
or attorney shall have the right to re-enter and remove all persons
therefrom."  . . .

*Who was Mr. C. Gurdy?  If there was in fact a man by that name,*

*was he, so far as said contract was concerned and so far as the control
of said gambling room by him was concerned, merely a straw man?*

· Said Perry, one of said three hotel clerks, in addition to what is
shown he testified above, further testified: "I have only met Mr. Gurdy
two or three times. I met him last summer at the hotel and saw him
again the first of this week. I have met him three times, I think.
I met him last fall just before the fair. Yes, I saw him last Monday
or Tuesday. *When Mr. Gurdy is here he stays at the hotel part of the
time.* . . . I don't know anything about what Mr. Strong received
from Mr. Gurdy for that hotel; I don't know that he received anything
from Mr. Gurdy; in fact, I never saw Mr. Gurdy and him have any-
thing to do with the books."

While said hotel clerk, Dymock, testified that he had seen Mr. Gurdy
pay Mr. Strong $250 per month rent at the hotel, he didn't know and
couldn't fix any date when this was done.

Said hotel clerk, Jim Riley, testified that he and the other two clerks,
Perry and Dymock, handled the receipts of the hotel; that he turned
the money over to Mr. Gurdy and that he, as a representative of Gurdy,
paid appellant the rent on the building when Mr. Gurdy was not in
the city. "Mr. Gurdy is here continually *except when he is off on short
trips.* I saw Mr. Gurdy here two or three days ago. I don't know
where he is today." (Of course, if Mr. Gurdy was not "here contin-
ually" he was certainly off somewhere else. He couldn't be at two places
at the same time.) Riley further said: "No, sir; I am not manager of
the hotel, I am a clerk in the hotel. I don't have charge any more
than the rest of the clerks."

There is no testimony whatever in this record which shows, or tends
to show that Gurdy, either directly or indirectly, had anything to do
with that gambling room or gambling establishment. In no way and
by no witness is he shown ever to have been in it or up the private
stairway from the hotel hallway where appellant kept his office and desk,
to said gymnasium or club rooms, or said gambling room. By no wit-
ness and by no pertinent testimony, circumstantially, is he shown to
have known that said poker or card room was constantly and contin-
uously used as a gambling room. He is not shown to have ever at any
time furnished, bought or paid for any of the gambling paraphernalia
therein, which was in constant use. The only circumstance, if that be
a circumstance, that would in any way connect him therewith, is that
appellant leased him the second and third stories of said building. He
is in no way shown to have given any personal attention whatever to
the running, even, of said hotel. That was turned over to, operated
and controlled exclusively by said three hotel clerks. The contempora-
neous construction of said purported lease contract of appellant to
Gurdy for the second and third stories of said building was, that
neither he nor any of his clerks, were to have anything to do with that
gambling room or said gymnasium department, which was by its con-
struction, use and operation, excluded from and in no way run in con-

nection with said hotel. All of his clerks testified that they had nothing to do with that separate and distinct department from the hotel. One of them testified that he had positive instructions to have nothing whatever to do with it; the others that they had nothing to do with it and that it was the club rooms of the Dallas Gymnasium and Athletic Club. No testimony whatever indicates that it had anything to do with said hotel or that said hotel had anything to do with it.

Appellant's main contention in this case, which is most vigorously and forcibly and adroitly presented, is the third ground of his amended motion for a new trial, complaining that the court erred in failing and omitting, in his charge, to affirmatively submit to the jury whether the defendant had the possession and control of said building and premises in question at the time the gaming alleged to have occurred therein, or whether said Gurdy had the actual exclusive possession and control of said premises at said time.

The court, in his main charge to the jury, instructed them: "If you find and believe from the evidence, beyond a reasonable doubt, that the defendant, W. T. Strong, did, as charged in the second count in the indictment, in the County of Dallas and State of Texas, at any time within three years next before the filing of the indictment in this case, knowingly permit a building, room or place there situate and which was then and there under his control, to be used as a building, room or place for the purpose of gaming and betting at a game played with cards, and that people did, with defendant's knowledge, resort to said building, room or place for the purpose of gambling and betting with cards, and were permitted to do so by defendant, and that people did then and there gamble and bet and wager at a game played with cards at said room, building or place with the knowledge of defendant and defendant permitted same, you will find the defendant guilty as charged in the second count in the indictment, and assess his punishment at confinement in the State penitentiary for any term of years not less than two nor more than four years, as you may determine and fix in your verdict." By this it will be seen that the court specifically required the jury, before they could convict appellant, to believe beyond a reasonable doubt that he knowingly permitted said gambling room "which was then and there under his control to be used as a room for the purpose of gaming and betting at a game played with cards." And further, "and that people did, with defendant's knowledge, resort to said room for the purpose of gambling and betting with cards and were permitted to do so by defendant." And that people did then and there so gamble and bet at a game played with cards; and that all this was done with his knowledge and that he permitted it.

The record further shows that appellant was not content with the specific requirements by the main charge of the court and he thereupon asked, and the court gave his special charge on this point as follows:

"You are instructed in this case at the request of the defendant to be construed in connection with the main charge of the court that

before you can find the defendant guilty under the second count contained in the indictment, you must believe from the evidence beyond a reasonable doubt, the defendant did knowingly permit premises under his control to be used as a place for gaming.

"And in this connection you are told that the word 'knowingly' means with full knowledge and intentionally—and unless you do believe from the evidence beyond a reasonable doubt that the defendant with full knowledge did permit the premises to be used as a place for gaming and further believe that the premises were under his control, you can not convict the defendant under the second count." By this special charge it will be seen that the court again, at the appellant's instance, specifically told the jury "you must believe from the evidence beyond a reasonable doubt the defendant did knowingly permit premises under his control to be used as a place for gaming," before they could convict him. And again, after defining that "knowingly" meant "with full knowledge and intentionally," further told them that before they could convict him they must believe from the evidence beyond a reasonable doubt that he "with full knowledge did permit the premises to be used as a place for gaming, and further believe that the premises were under his control."

The record further clearly shows that appellant did not except to the claimed omission, now urged, in the charge of the court at the time or during the trial, and that he asked no further or other charge on the subject, although he did request many other special charges, some of which were given and some of which were refused. Again, he made no complaint on this point in his original motion for new trial. The verdict was rendered on March 15, 1912. His original motion for new trial was filed the next day, March 16. His amended motion for new trial one week later, March 23; and then, for the first time, does he urge this claimed omission.

After a most careful and thorough study of the evidence in this case, I am of the opinion:

First, that the evidence in this case did not raise, and, therefore, did not require that the judge should submit to the jury for a finding whether or not C. Gurdy, and not appellant, was in control of said gambling room.

I have undertaken to give substantially all of the testimony and the lack of testimony on this point. Of course, it is elementary and needs no citation to the cases to show that the court must not submit an issue to the jury for a finding, when there is no evidence that would authorize or justify it.

Second, I am of the opinion that as the matter is presented, under the circumstances and in the condition in which the question is presented in this case that if it could be held there was any evidence tending to show that said Gurdy was in the control of said gambling room that such evidence "was not so pertinent and favorable that it might reasonably—not possibly,—be supposed that the jury could be influ-

enced by it in arriving at their verdict," and "unless the evidence be of such a character no injury appears, no injury is probable—not possible, but probable—and unless this appears there is no ground for reversal; and to reverse in the absence of probable injury would be contrary to principle."

I am not unmindful of the fact that article 743, Code Criminal Procedure, authorizes and permits a party to make an exception to the charge of the court, of either commission or omission, in the motion for new trial, and this court in all instances considers and passes upon such question only for the first time in the motion for new trial complained of; yet, this court, whenever the question has been raised and it is necessary to pass upon it, has always said: "Ever since the adoption of the amended article 743, this court has not looked with so much favor on the omissions in the charge of the court when no exception was made thereto at the time of the trial and no special charge covering the point, as if that course had been pursued on the trial." Mitchell v. State, 65 Texas Crim. Rep., 545, 144 S. W. Rep., 1006. I am not discussing and not holding that the court will not consider such objections thus for the first time in the motion for new trial made, but I am discussing what effect and what weight should they have when thus first made. This question was fully discussed by this court in a well considered and able opinion, both in the original opinion and an opinion on rehearing by Judge Hurt, in Davis v. State, 28 Texas Crim. App., 542, and has many times been quoted and adhered to by this court. In said Davis case the court charged on murder in the first degree only. In the motion for new trial, for the first time, appellant claimed in that case that the evidence raised the question of murder in the second degree and complained that the court committed reversible error in omitting and failing to submit murder in the second degree. In that case no exception was taken to the charge of the court at the time of the trial on that account, but the question was first raised in the motion for new trial. While the opinion in this case will necessarily be lengthy and while I regret to do so, I will here copy what Judge Hurt says on this point in said Davis case. He said:

"In this connection we call attention to the opinion of Roberts, C. J., in Bishop's case, 43 Texas, 390. He says: 'This difference in the rule, dependent upon the time when the objection to the action of the court is made, is in harmony with the rules of judicial proceedings generally, that a party who makes an objection at the proper time, which is usually the first practical opportunity, shall have his objection more favorably considered than if it had been inopportunely delayed.' In the above the Chief Justice is wrong if the counsel is right.

"The statute, as is well known to the profession, provides that if there be error in the charge in a felony case, and it is excepted to at the time of the trial, the judgment should be reversed. But suppose there be error and the accused fails to except, will the judgment be reversed in all such cases? By no means. We will let Chief Justice

Roberts state the rule applicable to such a state of case: 'It is to be particularly noticed that the record shows, and properly by a bill of exception shows, in this case, that this charge was excepted to by defendant's counsel at the time of the trial, and before the case had been submitted to the jury, and before they had retired to consider of their verdict; and that thus an opportunity was given to the judge to correct or withdraw the charge if he had deemed it to have been improper, upon a reconsideration of it then made before the final submission of the case to the jury. This, in reference to the provisions of our Code of Criminal Procedure, will be found to be an important consideration in this case on appeal to this court, by the exceptions having been made, and shown by the bill of exceptions to have been made at the time of the trial, and to be much more beneficial to the defendant than if not then made; but made only afterwards on a motion for a new trial.'

"If such a charge is not excepted to at the time of trial, but is presented in a motion for new trial, which is the next point at which it could be presented, then its consideration by this court would be subject to another and a very different rule, which would be whether or not such charge was an error, which, under all the circumstances, as exhibited in the record, was 'calculated to injure the rights of the defendant,' and which is prescribed as one of the grounds for the granting of a motion for a new trial, in the following language: 'Where the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant.'

"Of what degree of force must the evidence be that tends to establish an offense, or tends to mitigate the offense charged in order to require a charge applicable thereto? Chief Justice Roberts says that if its force is deemed to be very weak, trivial, or light, and its application remote, 'the court is not required to give a charge upon it.' 'If, on the other hand, it is so pertinent and favorable as that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, the court should charge so as to furnish them with the appropriate rule of law upon the subject.' Bishop v. State, 43 Texas, 390. Hence, unless the evidence tending to present a less degree of an offense, or any theory of defense, be so pertinent and forcible that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, a failure of the court to charge thereon would not be ground for reversal in the absence of exceptions.

"This position is in exact harmony with the first opinion in this case, and in accord with Bishop's case, supra, and a number of cases decided by this court, notably Cunningham's case, 17 Texas Crim. App., 89; Elam's case, 16 Texas Court of Appeals, 34, and Leeper's case, decided at the present term, but not yet reported. See also Johnson's case, 27 Texas, 758.

"Loose expressions upon this subject can be found in the opinions of this court, but the principle is well settled and is absolutely correct,

whether this court has always adhered to it or not, that in the absence of exceptions to the charge of the court, for this court to reverse, the evidence tending to present a phase of the case or theory favorable to the accused must be so pertinent and favorable that it might reasonably—not possibly—be supposed that the jury could be influenced by it in arriving at their verdict. Unless the evidence be of such a character no injury appears, no injury is probable—not possible, but probable—and unless this appears there is no ground for reversal; and to reverse in the absence of probable injury would be contrary to principle."

On this point I, therefore, hold that even if I am mistaken in holding that there is no evidence that authorized or required the submission of this question to the jury in this case, that if there was any, as said above, it was not sufficiently pertinent and favorable to appellant that it might reasonably—not possibly—be supposed that the jury could be influenced by it in arriving at their verdict; for the evidence in this case, if there was any at all, was not of such a character on this point as to show any probable injury to appellant, and this not appearing, even though it might be considered to be an omission, is no ground for reversal, for "to reverse in the absence of probable injury would be contrary to principle." Bishop v. State, 43 Texas, 390; Maxwell v. State, 31 Texas Crim. Rep., 119; Cannon v. State, 41 Texas Crim. Rep., 467; Alexander v. State, 63 Texas Crim. Rep., 102.

In this connection, as I understand appellant's contention, he urges that the fact that he rented, if he did, said premises to C. Gurdy and that C. Gurdy, if he did, took actual possession of said Astor hotel, that he (Gurdy) was thereby in possession and control of said gambling room, and that appellant was not. I think that the evidence demonstrates, as shown above, that said Gurdy was never either in the actual possession of said gambling room, or in control thereof at any time. The contemporaneous construction of said lease, as clearly shown by the evidence between said Gurdy and appellant was that said gambling department was not a part of the hotel; that neither Gurdy in person nor by either, any, or all of his three hotel clerks, ever asserted, claimed or exercised any possession of, or right to the possession of or any control of, or right to the control of said gambling department. It was entirely separate and distinct and so constructed to be no part of the hotel, not used or operated in connection therewith and had nothing whatever to do therewith. The only possible connection in the construction of said hotel and of said gambling department that was in any way common, was that to enter said gambling department persons had to go up the main open stairway from the street to the landing in the hotel on the second floor, which was open and accessible to any and every one at all times; thence along the hallway by appellant's desk and his place of business, where practically he continuously stayed; thence up a private and secluded stairway into the gambling department, and there was no means whatever of passing from the third story part of the hotel to this gambling department. There is no evidence whatever

in the record that said Gurdy was ever in said gambling department, or ever saw it, or ever had anything to do with it, or knew anything about it. And the said purported rent contract between Gurdy and appellant, specifically therein stated that the leased premises were *"to be occupied as a hotel and not otherwise."* Suppose it be conceded, however, that the said purported lease contract between appellant and Gurdy, as originally entered into, gave Gurdy the *right* to the possession and control of said gambling department. The *right* to the possession and control of a thing is a very different thing from the *actual* possession and control thereof. Gurdy was never shown to have been in the *actual* possession or control of said gambling department. But, as stated, concede that he had the *right* to it originally given by this contract, then let's see what became of that *right*. The uncontroverted evidence overwhelmingly established that that gambling department was set up by appellant with his gambling paraphernalia, claimed by him and replevied by him when the officers raided and took it, and he was repeatedly therein while gambling was going on and saw and knew it and actually himself engaged in some of the gambling games. Then what was the result so far as the *right* of possession and control in Gurdy was concerned? In such case the statute, article 567, Penal Code, specifically says: *"The use of any house, property or premises, by any tenant or lessee for any purpose, made unlawful by this law, shall terminate all rights and interests of such tenant or lessee in same."* And the statute continues, "and shall entitle the owner thereof to the immediate possession of said house, property or premises." The law itself says that the moment this purported leased gambling establishment by appellant to Gurdy, being from the very first used as a gambling room, absolutely terminated Gurdy's *right* thereto.

There can be no question, under the law, but that by said purported contract between appellant and Gurdy appellant was his landlord and Gurdy was his tenant. Gurdy was at no time and in no way the tenant of the owner, H. L. Edwards, of said property. There was no privity of contract between Gurdy and Edwards whatever. Edwards, through his agent, specifically and pointedly refused to release appellant, his tenant, in any way from his two years lease. Gurdy's subtenancy and his contract therefor under appellant was only for a part of appellant's term. If appellant had refused, or failed to pay his rent to the owner, Edwards, or had in any other way violated his lease contract, the owner, Edwards, could not have sued or held Gurdy responsible for the rent thereof. This question has so recently been fully discussed and decided by our Supreme Court in an able opinion by Mr. Justice Dibrell in the case of Davis v. Vidal, 151 S. W. Rep., 290, that there is no use for further discussion on this subject.

It is true that before the passage of this Act that the landlords or lessors whose premises theretofore were used by their tenants or subtenants, escaped under the previous decisions of this court, many of

which are cited by appellant in his brief; but the Legislature intended that no longer should the landlord, whether he was owner in fee of the premises or whether he was the lessor and sublet to a subtenant, hide behind any such claimed immunity.

Great reliance is placed by appellant in the case of Commonwealth v. Wentworth, 146 Mass., 36. I have carefully read and studied that case. In my opinion, instead of being in favor of appellant's position it is against him. The report of that case shows that the Act under which that prosecution was had provided three separate and distinct offenses,— first, where a person owned a building and had control of it, knowingly let it for the purpose of being used as a gambling house; second, or while having the building under his control he knowingly permitted it to be used for said purpose; or, third, if after due notice that the property was being used by a tenant, or subtenant for said purposes, the landlord omitted to take all reasonable measures to eject the party, then in each of the three instances, he was guilty of an offense. The difference between that law and ours is that it is made no offense by our law, when the landlord finds his tenant is illegally using the leased premises for a gambling house, to omit all necessary steps within a reasonable time to eject him, but our statutes, as quoted above, says that the use of any property by any tenant or lessee for gambling "shall terminate all rights and interest of such tenant or lessee in the same," and it further says that such use of such premises shall entitle the owner to the immediate possession thereof, but does not make his neglecting to take immediate possession any offense whatever, as the Massachusetts statute did. And the court in said Massachusetts case, specifically and pointedly said of their statute: "If the statute had been less carefully drawn there would be some force in the contention that a person may be said to permit what he does not prevent, if he has lawfully the power to prevent it, and it is made by law his duty to prevent it. But the last clause of the section was, we think, intended to define the whole duty of a landlord who, having let his building not knowingly for any of these illegal purposes, has due notice that the tenant, after he has taken possession and control, is using the building for these purposes." And that court held Wentworth should have been prosecuted for said second and not the third offense prescribed.

What the Massachusetts law provided for, as said by the court in the quotation above, our statute makes no such provision. Presiding Judge Davidson, in his dissenting opinion in the case of Austin v. State, 61 Texas Crim. Rep., 573, pertinently and correctly, on this point, said: "If the owner of the house rents it to another, and the house is used for gaming purposes, when the renter did not rent it for that purpose, and he ascertains that his house is being so used, and he thereafter permits the gambling to go on, he would be guilty of permitting his property or premises to be so used." In announcing said principle he was but following the opinion of this court delivered by him in the case of Rankin v. State, 42 Texas Crim. Rep., 1. The Rankin case is perti-

nently and clearly in point in this case. Rankin was prosecuted for permitting gaming to be carried on in his house or on property under his control. The court held the reverse of appellant's contention. In the Rankin case, which was long before article 567, Penal Code, above quoted, was enacted, the facts were, that Jim Rankin, appellant's brother in that case, was in the employ of Charles Rankin, as his bartender in the saloon; that he, Jim Rankin, had the management and control of it, and without asking his brother's consent, had the room in which the gambling occurred cut off by a partition wall, which room so cut off he rented to one Moore. The expense attached to fixing up this cut off room was taken out of the business funds of the appellant, and Jim Rankin rented said cut off room to Moore for $12.50 per month. That Moore used that room for gambling purposes and that appellant, his brother, knew of that use of that room. Under such circumstances, appellant, Charles Rankin, in that case, even went so far as to ask a special charge to the effect that if from the testimony the jury believed said room where said card playing was done which had been rented to said Moore was, at the time, under the control of said Moore they would acquit the defendant. Judge Davidson in that case said: "We believe the court did not err in refusing the charge. The room was in the saloon of appellant, and, therefore, on his premises, and it would be immaterial under the circumstances that the room may have been controlled for gambling purposes by Moore." See also Mahan v. State, 42 Texas Crim. Rep., 410; McGaffey v. State, 4 Texas, 155; Flynn v. State, 35 Texas Crim. Rep., 220; Forbes v. State, id., 24; Humphreys v. State, 34 Texas Crim. Rep., 434.

In this case, as I have shown above, the evidence excluded the idea that Gurdy was ever, either in possession or control, at any time, of said gambling room. But even if there was some circumstantial testimony in some slight way tending to show that he was either in possession or control of said gambling room, appellant did not request any charge on that point in the trial and did not even then except to the charge of the court because of any such claimed omission. In the Moore case, supra, the proof not only positively showed that Moore had not only actually rented that room but that he, Moore, was in actual possession and control thereof, and actually used it for a gambling room, and appellant did not, and yet, as said by Judge Davidson in that case, it was immaterial that the room may have been rented to, in the actual possession of, and controlled by Moore for gambling purposes, Rankin was properly convicted.

In several cases recently decided by this court, particularly in Robertson v. State, not yet reported; Davis v. State, 151 S. W. Rep., 313, and Santos v. State, 65 Texas Crim. Rep., 518, 116 S. W. Rep., 919, we have thoroughly discussed the law and the evidence of what is necessary to show that a person is in control of premises where gambling is carried on. These cases, in my opinion, are exactly in point and applicable to the same question in this case. It is unneces-

sary, therefore, for me to further discuss that question in this case. I refer and cite those cases for a full discussion and decision of the question.

Appellant urges that the lower court committed reversible error in refusing his motion to require the county attorney to place the names of the State's witnesses on the indictment, or furnish him their names. The indictment in this case was returned and filed February 7, 1912. On March 1st following, the case was set for trial for March 13, 1912. On March 1st, the court heard said motion and then overruled it. In the motion, as shown by the bill excepting to its overruling, appellant states the reasons why it is necessary and proper for him to have the names of said witnesses, which is in full substance and effect, that he does not know what their testimony will be so that if they give any testimony against him, he will have no reasonable opportunity to rebut it, or secure the presence of any other witness to testify to the truth regarding said transaction, and no opportunity to prepare to impeach the testimony of such State's witnesses giving testimony against him. And that if he now has their names that he will then have the opportunity to prove the falsity of such testimony and be able to impeach any such State's witness. The court stated as a reason why he overruled said motion, when he first did, this: "The court in this and other gambling cases, thought it proper, in the light of experience, to refuse this request in the interest of the enforcement of the law." When the matter was again presented to the court, when the case was called for trial, appellant's counsel called his attention again to his motion and asked if the previous ruling still stood, to which the court replied, "it does." Then the court, in further explanation of said bill, stated: "If they had asked it. I would have, as I did in other like cases after announcement by both sides, required the State and defendant to furnish each other with list of witnesses. *Defendant does not attempt to show any injury resulting therefrom.*" This bill being thus qualified by the court and accepted by the appellant, he was bound thereby as held uniformly and in many cases by this court.

The record shows without question and without doubt that every witness who testified for the State lived in the City of Dallas and that appellant had lived there for many years, and most every witness, if not every one, showed that he knew appellant, and we conclude that appellant must have known each of them. The record also clearly and without doubt shows that the trial lasted for two days at least. His original motion for new trial was filed on March 16, 1912. His amended motion in lieu of it was filed on March 23, 1912. It was heard *and the evidence thereon was heard,* and was overruled on March 23, 1912. In no way did appellant show or attempt to show, so far as this record is concerned, any injury, the slightest, to him by reason of the court's overruling said motion to require that he be furnished with the names of the State's witnesses. And, as stated by the court, which

I think, under the circumstances, was conclusive against appellant, *"defendant does not attempt to show any injury resulting therefrom."*

It is true article 444, Code of Criminal Procedure, says: "The attorney representing the State shall prepare all indictments which have been found by a grand jury with as little delay as possible, and when so prepared shall deliver them to the foreman, who shall sign the same officially and the attorney representing the State indorse thereon the names of the witnesses upon whose testimony the same was found." This statute in substance and in effect has been the law of our State ever since the organization of the State. As early as 1846 our Supreme Court, then composed of Judges Hemphill, Lipscomb and Wheeler, in the case of Steele v. State, 1 Texas, 142, expressly held that the provisions of this law *"are clearly in their character directory."* This decision has been followed in a great many cases since then down to this good day, that the statute was directory, and said decision has never been overruled, qualified or modified. In said decision and every other on the subject, it has always been held by the Supreme Court and this court, that it is no part of the indictment, and that the names of the witnesses if not placed on the indictment in no way affects its validity for any purpose. Our statute also requires when an accused is in jail under such indictment that a copy of it shall be served upon him two days before trial. It has also been held all the time and without any exception, that a copy of the indictment served upon him which did not contain the names, even when they were written thereon, in no way affected the service of such indictment upon him, but that such service of such indictment with their names left off was perfectly valid. And that appellant, even did not have a right, on that account, to demand a postponement of the trial until a copy was served upon him with the names so indorsed. Hart v. State, 15 Texas Crim. App., 202; Walker v. State, 19 Texas Crim. App., 176; Luster v. State, 63 Texas Crim. Rep., 541. And that a failure to indorse the names of the witnesses on the back of the indictment constitutes no ground of exception, either to the substance or form thereof, and that it constitutes no grounds of objection to a witness testifying that his name has not been indorsed upon the indictment. It is unnecessary to cite the cases upon these points, because it has so uniformly and many times been decided that that is the law, it can not be questioned. If by the fact of appellant not being furnished with these names prior to the trial, he was injured in the slightest, he had every opportunity and ample time, before he filed his amended motion for new trial, to have shown it, but, as stated by the court, he didn't even *"attempt to show any injury resulting therefrom."*

It is true, as stated by Judge Harper in his opinion, that our Constitution, section 10, article 1, specifically says that the accused "shall have the right to demand the nature and cause of the accusation against him and to have a copy thereof." But this can not be construed to mean, and has never been construed by this or the Supreme Court to

mean that he shall have the right under this provision of our Constitution to the names of the witnesses who are or ought to be on the back of the indictment. But it has always been held that that provision of our Constitution means that he shall have a copy of the indictment itself. And as held by this court, and the Supreme Court, the names of the witnesses who are or ought to be indorsed on the indictment is no part thereof for any purpose whatsoever. There is no provision of our statutes or Constitution, as claimed by Judge Harper, which provides that the accused shall have the right to know the "names of the witnesses upon whose testimony the accusation and cause is founded." At least, I have been unable to find any such provision, and he cites none, and Harris' Texas Constitution, cited by him on pages 85 to 89, neither cites any such statute, constitutional provision, nor case so holding. All of these cases cited in Harris' Constitution by Judge Harper are on the subject of an accused having the right to have a copy of the accusation against him which, as I have said, is a copy of the indictment itself, and the names of the witnesses, by all the decisions, held not to be any part or parcel of the indictment or charge against the accused. His contention that the withholding of such names from the indictment or from an accused might be construed to be an imputation against the witnesses and an apprehension on the part of the State that if known they would be tampered with, I think, has no application to the question. This cuts both ways. It occurs to me that instead of being an imputation against the State's witnesses, that it is rather, if anything, an imputation against an *accused* that the *accused* and his friends will tamper with and try to cause witnesses to either "forget," "not remember," or testify falsely. For my part, I prefer to stand, and do stand, as the lower court did, *for the enforcement of the law,* for as stated by the judge of the lower court in qualifying said bill, "the court in this and other gambling cases thought it proper in the light of experience to refuse the request *in the interest of the enforcement of the law."* I believe that the other 4,000,000 of people of this State have some rights as well as an accused. The other 4,000,000 people of this State have the right to have their laws enforced. I would not deprive any accused of whatever crime accused, of any substantial right he has and that is guaranteed to him by our law, nor would I deprive him in any way of a fair and impartial trial and of the protection of his rights for that purpose in any and every way. I do not regard that the accused in this instance in this particular has in any way been deprived of any substantial right by the action of the court in this matter. As stated by the court he *didn't attempt to show that he was, in any way, injured thereby.* If he had been he had ample time and could have unquestionably shown it, and if he had been deprived of any substantial right or injured, I would gladly concur in so holding. This court in many cases, needless to cite, has always held, as tersely stated by Judge Hurt in Davis v. State, 28 Texas Crim. App., 542, supra, *"to reverse in the absence of probable injury would be contrary to principle."* This prin-

ciple has been in many recent decisions of this court, as well as early decisions, quoted, approved, stated and applied. Alexander v. State, 63 Texas Crim Rep., 102; Knight v. State, 64 Texas Crim. Rep., 541, 144 S. W. Rep., 967, as well as many others.

It is further my opinion and belief that all of the directory statutes of our Criminal Procedure are enacted and intended to be enforced for the purpose of arriving at the truth in every case that is tried, and for the protection of the accused, when it is a protection to him. But in no instance should they be construed so as to prevent the truth from being arrived at instead of it being established. When that has been done and an accused has not been injured he is not entitled to a reversal of his case. The very Code itself, article 25, expressly says: *"The provisions of this Code shall be liberally construed so as to attain the objects intended by the Legislature; the prevention, suppression and punishment of crime."* This court and the Supreme Court have uniformly construed all of our Procedure statutes, even though they state, that this or that "shall be done," or shall not be done in the trial of a case as directory. This has been the case in the organization of a jury, the challenge of jurors, the admission or exclusion of evidence, the charge or lack of a charge, the form and verbiage of a verdict, the argument of the prosecuting officers, the misconduct of a jury, and in every other procedure relative to the trial of a case. The whole trend of our decisions on these subjects is to this effect. I think it useless to collate or cite the cases so holding. The books are full of them.

By another bill appellant complains that the jury referred to and discussed his failure to testify. Even if we could consider this bill on this subject it appears therefrom that the court heard evidence on the subject and from that evidence was justified to find, as he did and as he stated in his qualification to the bill on the subject, "the court, after hearing the evidence on this matter, found as a matter of fact that the jury did not talk about or consider or discuss the defendant's failure to testify."

By another bill appellant complains that the court asked his witness, Jim Riley, certain questions. The questions and answers are quoted in Judge Harper's opinion. This bill shows that this witness in the cross-examination by the State of him, before the court ever asked any of these questions, had testified substantially to everything that he testified to in answer to the court's questions, unless it be that before asked by the court, he testified that he had been up in said gambling room and gambled himself, and that he did not gamble up there, *unless he was drinking.* When asked by the court he testified that he may also have gambled up there, as shown by the questions and answers, when he *was not drinking.* How it is possible for this to have injured the appellant in any way, I am unable to see or conceive. I am unable to see also that the last question asked by the court, "All the time you have been paying money, paying rent, to Strong?" A. "Yes, sir," is in the slightest any intimation by the court that appellant was guilty in the

court's opinion. This witness, in both his direct and cross-examination before the court ever asked this question, testified substantially and fully the same thing. And also the other two clerks had substantially testified to the same thing. There wasn't the slightest question of this fact. It was a part of appellant's case and he himself brought it out, that these clerks, including this witness Riley, had been promptly paying him the rent from month to month during the whole year of 1911. In my opinion the court's asking these questions in no way could have injured appellant and they did not injure him nor did the court thereby or therein intimate to the jury that in his opinion the appellant was guilty. If by any means these questions by the judge could be held to intimate the guilt of the appellant, in his charge he specifically and expressly required the *jury itself* to believe beyond a reasonable doubt every essential element necessary to establish the guilt of the appellant before they could convict him. Besides this, the bill does not state any of the other proof on this subject, and so far as it shows, and as a matter of fact, the record does show, these facts were uncontroverted in any way by the State. In Testard v. State, 26 Texas Crim. App., 260, this court said: "Wisely, we think, the law vests a trial judge with a broad discretion . . . to direct and control the introduction of evidence and the examination of witnesses. Before this court will revise the action and rulings of the trial judge in such matters and pronounce the same erroneous, it must clearly appear to us that the trial judge has abused this discretion confided in him by law and that thereby the defendant has probably suffered injury to his legal rights."

There is but one other question necessary to be stated or discussed, and that is appellant's claim in his motion for new trial that one of the jurors told another what had occurred in another case about another appellant pleading guilty after he, that juror, had hung the jury and prevented a verdict. This is also substantially stated by Judge Harper in his opinion. The motion on this ground had attached to it and made a part of it, the affidavit of these two jurors of what one told the other, and the effect that it had upon that one juror so told. I have never understood that the allegations in a motion for new trial setting up misconduct of the jury, or the receipt by the jury of new or additional testimony, proved itself. It is but a mere pleading. It must be supported and established by the evidence on the hearing thereof. Such allegation in a motion is no more proof of the fact than any other pleading in a criminal or civil case. It can be no more held to establish the asserted pleaded fact than can the allegations in an indictment alleging a certain state of fact establish such fact. It is merely the basis for introducing proof to establish it. Every indictment by a grand jury alleges in its face: "And the grand jurors aforesaid, upon their oaths in said court do present that," etc. As a matter of fact every indictment is returned upon the oaths of the grand jurors. If it could be properly held that the allegation of the misconduct of the jury in a motion for new trial, when supported by the affidavit of the appel-

lant and other witnesses as a part thereof, was sufficient to establish the fact, then every such indictment could be so properly held. It has always been held that applications for a writ of habeas corpus, which are sworn to, did not prove themselves; that such allegations were a mere pleading and they had to be supported on the trial by proof then introduced. Naill v. State, 59 Texas Crim. Rep., 140; Robertson v. State, 63 Texas Crim. Rep., 280; Ex parte Thomas, 65 Texas Crim. Rep., 537, 145 S. W. Rep., 601; Ex parte Basham, 65 Texas Crim. Rep., 533, 145 S. W. Rep., 619. And when not so supported by evidence this court has uniformly affirmed such cases. So in every case where a conviction has been had, from the highest to the lowest offense, when there is no statement of facts this court has all the time and in every case held that it must presume and does presume that the evidence which was introduced was sufficient and did establish the offense and justify the verdict of conviction. This court from week to week so holds and affirms cases. Probably no volume of the Reports is without cases so affirmed. It has also been the uniform holding of this court heretofore in every contest made by motion for new trial, attacking the verdict of the jury on the grounds that the verdict is attacked in this case, when evidence has been introduced and not shown to this court either by a statement of facts or bills of exceptions, timely filed, that it must presume and does presume that the court correctly held after hearing and considering the evidence. This question is not presented to this court by any bill of exceptions whatever, neither does the record in any way contain any statement of facts introduced on its hearing. The judgment of the court in acting on said motion for new trial, which embraced said grounds of attack on the verdict, clearly, pointedly and specially says: "On this day came on to be heard the first amended motion of the defendant, W. T. Strong, in the above entitled and numbered cause, for a new trial, the defendant having been granted leave of the court to file said amended motion for a new trial in lieu of his original motion for a new trial filed herein on March 16, 1912, and appeared the parties, the State by her county attorney, and the defendant, W. T. Strong, in person and by attorney, and the said motion *and the evidence* and argument thereon having been submitted, the court is of the opinion that the same should be refused and overruled." And thereupon the judgment proceeds to overrule said motion. This record has not been contradicted and can not be contradicted. This court is bound by it, and this court must presume, as it does in every such case, that either the evidence introduced failed to sustain such attack upon the verdict of the jury, or the State by proper and ample evidence showed the falsity thereof. The credibility of the witnesses and the weight to be given to their testimony, like the verdict of the jury, must be passed upon and was passed upon by the judge of the lower court, who heard them testify, saw their manner of testifying, and manner of examination and their testimony. And he, after hearing, as stated, *the evidence and argument* on said grounds of the motion

as well as all the others, reached the conclusion that the evidence did not establish it, or that the State disproved it, and overruled such motion on that account. Such being the case, this court can not, in my opinion, legally disturb such judgment under the circumstances, and in my opinion the judgment of the court should be by this court sustained.

When I first prepared this opinion I did so under the idea that it would be the basis of the affirmance of this case and that the case would be affirmed. Otherwise, I would not have written so fully and would not have quoted the evidence and given the substance thereof so fully. Since I wrote the original opinion and after being furnished with Judge Harper's opinion, I, having had Judge Davidson's prior thereto, have revised and rewritten my opinion on the last four questions discussed by me herein. In my judgment this case should unquestionably be affirmed, and I earnestly dissent to its reversal.